COMMONWEALTH *vs.* PAUL E. NUTILE, JR.

No. 90-P-868.

Middlesex. April 19, 1991. - December 4, 1991.

Present: PERRETTA, FINE, & LAURENCE, JJ.

*Search and Seizure,* Threshold police inquiry, Automobile, Exigent cir-
cumstances. *Constitutional Law,* Search and seizure. *Evidence,* Sponta-
neous utterance, Prior conviction. *Witness,* Impeachment. *Practice,
Criminal,* Argument by prosecutor, Instructions to jury. *Controlled
Substances. Due Process of Law,* Vagueness of statute.

In a criminal case, the judge properly denied the defendant's motion to
suppress evidence seized from an automobile in which he was riding,
where the record of the hearing on the motion demonstrated that the
police acted lawfully in the circumstances in following and stopping the
vehicle, ordering the occupants from the vehicle and frisking them, and
searching the car and containers therein. [618-619]
A criminal defendant could have no expectation of privacy in items he
threw from an automobile lawfully being pursued by police officers.
[619]
No error appeared at a criminal trial in the judge's refusing to allow in
evidence hearsay statements made by the driver of an automobile in
which the defendant was a passenger to police officers at the moment
the officers found a container of white powder in the vehicle. [619-620]
At the trial of an indictment for trafficking in cocaine, the judge properly
allowed the prosecutor to use the defendant's prior conviction of posses-
sion of cocaine with intent to distribute in order to impeach the defend-
ant's credibility. [620-621]
There was no merit to the claim of a criminal defendant that the prosecu-
tor misstated the evidence during his closing argument. [622]
The term "mixture" as used in G. L. c. 94C § 32E(*b*) ("any mixture con-
taining a controlled substance") was not unconstitutionally ambiguous
as applied to a defendant who possessed 84.62 grams of a substance
assayed at less than one per cent cocaine, and the judge's instruction on
that issue was correct. [622-625]

INDICTMENT found and returned in the Superior Court De-
partment on November 8, 1988.

A pretrial motion to suppress evidence was heard by *Richard S. Kelley*, J., and the case was tried before *Paul A. Chernoff*, J.

*James M. Smith* for the defendant.

*Patricia M. Darrigo*, Assistant District Attorney (*Stephen Hoctor*, Special Assistant District Attorney, with her) for the Commonwealth.

PERRETTA, J. On appeal from his conviction for trafficking in cocaine, the defendant claims error in: the denial of his motion to suppress evidence found in the car in which he was a passenger as well as items he threw from the car while being pursued by the police; the exclusion of a hearsay statement of a coventurer which he argues was an admissible spontaneous utterance; the use of his prior drug conviction to show statements inconsistent with his testimony; the prosecutor's reference to a gun in his closing argument; and the judge's instruction to the jury that, in determining the amount of cocaine in issue, they could also consider the weight of any dilutant or mixing agent. We affirm the conviction.[1]

1. *The facts.* As the Commonwealth's case is largely dependent upon the evidence seized from the car and found in the areas of the chase, we relate the facts as found by the judge after the hearing on the defendant's motion to suppress, filling in some of the details on the basis of undisputed evidence in the transcript of that hearing. Those facts pertinent to the defendant's other claims will be taken up later.

On August 5, 1988, Michael Benson, a plainclothes narcotics detective with the Waltham police department, received information from a number of sources that Joseph Paolino was trafficking in cocaine and that he was known to carry a gun. Neither Benson nor his partner, Timothy McDaniel, knew Paolino. About 8:00 P.M., that date, the of-

---

[1]We do not consider the defendant's conviction for possession of a hypodermic syringe as that indictment was placed on file with the defendant's assent, and there are no exceptional circumstances warranting our consideration of his conviction on that indictment. See *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

ficers, while driving in their unmarked cruiser, decided to begin a surveillance of Paolino. They drove to an address that had been given them, 162 Prospect Street.

As they drove along Prospect Street, the officers saw two men seated in a red and white Cadillac parked in front of a house at the address given them. They recognized the man in the front passenger seat as the defendant. The officers knew the defendant and knew that he had been arrested recently for possession of cocaine with intent to distribute and assault and battery of a police officer. They were also aware of the fact that the defendant had been arrested twice in 1986, once for possession of a shotgun and then for possession of handgun ammunition. When the officers drove past the car, they saw the driver get out and run into the house at 162 Prospect Street.

Proceeding up the street, the officers made a U-turn and returned. As they were doing so, they verified that the car was registered to Paolino. Just as they were again passing the car, they saw Paolino run out of the house and get back into his car. He had a gun tucked in the waistband of his trousers.

When Paolino drove away, the officers decided to follow him and the defendant. They drove along about two car lengths behind Paolino. Because of the distance and the hour, they could see into the car through its back window. It was not long before Paolino and the defendant began turning in their seats to look out the back window. After several such glimpses, the defendant momentarily disappeared from sight, apparently bending forward in his seat. When he came back into view, the officers saw him reach back over into the rear seat, all the while watching the unmarked cruiser through the back window. Coming to an intersection, Paolino went through a stop sign and turned left.

Now on a narrow, curving, two-lane road, Paolino found himself behind a slow moving car, with the unmarked cruiser still following him. Paolino closed the distance between his car and that in front of him to about one foot. It was after witnessing these two traffic violations, failure to stop and fol-

lowing too closely, that the officers decided to stop the car. They turned on the cruiser's blue grill lights, but Paolino refused to pull over. Next the officers activated the cruiser's siren. Paolino pulled out, crossed the double-yellow traffic lines, and accelerated his car to about eighty miles an hour. The posted speed was thirty.

What had begun as surveillance now changed to pursuit, with the officers calling for assistance. As Paolino sped along, the State, Weston, and Newton police were alerted. Throughout the chase, Benson and McDaniel could see the defendant hurling objects out his window. Now on Route 30, Paolino was nearing the entrance to the Massachusetts Turnpike. The chase ended when he was forced to stop behind two or three cars at a red light. Benson and McDaniel pulled alongside Paolino's car, and the Weston police came from behind, making further flight impossible.

Approaching the car with their weapons drawn, the detectives ordered Paolino and the defendant out of their car. While the Weston police and McDaniel stood by the defendant, Benson arrested Paolino for his numerous traffic violations and frisked him. Not finding the gun, Benson looked into the car and saw a pouch with a bulge hanging from the rear of the driver's seat. He reached into the pouch and pulled out a round plastic container which he could see held a white powdery substance.

A field test was conducted on the powder, and it proved positive for cocaine. The defendant and Paolino were arrested on drug charges. They and the car were searched, and each man was found to be in possession of money and notes consistent with drug transactions. The officers then returned to the wooded areas along the route of the chase where they had seen the defendant throwing objects from the car. Because of the terrain and the fact that it was now dark, they found nothing.

When they returned to these areas the next day, the officers found a large canvas bag with numerous items strewn about and near the bag. Those items included a notebook, a

scale, many syringes, a bottle of "crack-type cocaine," and two clear plastic bags of cocaine.

2. *The motion to suppress.* There can be no question that the detectives had a right to follow Paolino and the defendant as they drove away from 162 Prospect Street. "We will not scrutinize police activity based on hunch or suspicion [or confidential tips] until such time as that activity clashes with individual rights." *Commonwealth* v. *Wooden,* 13 Mass. App. Ct. 417, 419 (1982). Further, the detectives' decision to stop Paolino was justified. He had just committed two traffic offenses. The pursuit of Paolino did not begin until after he refused to stop and, instead, crossed over the double traffic lines into the opposite lane and accelerated his car to a speed well in excess of the posted limited. See *Commonwealth* v. *Wren,* 391 Mass. 705, 707 (1984), and cases therein cited. Compare *Commonwealth* v. *Thibeau,* 384 Mass. 762 (1981); *Commonwealth* v. *Lyons,* 409 Mass. 16 (1990).

Once the car was finally stopped, the detectives had the right to order its occupants to step out and to frisk Paolino. They had seen Paolino get into the car with a gun, they knew that the defendant had possessed firearms in the past, and they were entitled to protect themselves. See *Commonwealth* v. *Almeida,* 373 Mass. 266, 271-272 (1977); *Commonwealth* v. *Robbins,* 407 Mass. 147, 151-152 (1990). When the gun was not found on Paolino, the situation changed dramatically. At that point, the detectives had every reason to believe either that the gun was in the car, or worse, that it was one of the objects thrown from the car by the defendant, who had not yet been arrested. On these facts, as well as the fact that the detectives had seen the defendant reaching over into the back of the car, we conclude that Benson acted prudently and reasonably in removing the bulging object from the pouch.

We need not quibble with the defendant as to whether there was probable cause to search the car for drugs or whether Benson could see into the container without opening it. In our view, the situation was now exigent. If the gun could not be found in the car, it might well be on or near a

public way. The search of the car and any containers was justified. See *Commonwealth* v. *Moses*, 408 Mass. 136, 144-145 (1990).[2] After cocaine and other evidence of drug transactions were found in the car, the defendant was arrested.

Turning to the objects thrown from the car during the chase and retrieved the next day by the police, we think it clear that the "defendant had voluntarily given up all control over the . . . [items] and could have no expectation of privacy with respect thereto [citations omitted]." *Commonwealth* v. *Battle*, 365 Mass. 472, 475-476 (1974). See also, *Commonwealth* v. *Lanigan*, 12 Mass. App. Ct. 913, 914 (1981). His reliance upon *Commonwealth* v. *Pimentel*, 27 Mass. App. Ct. 557, 560 (1989), for the proposition that he did not throw the objects until after he had been impermissibly detained, is based upon his reasoning that once the officers signalled for Paolino to pull over, he and the defendant were no longer free to leave. Neither that argument nor the claim that the arrest was a pretext (see *Commonwealth* v. *Petrillo*, 399 Mass. 487, 490-491 [1987]) warrants any discussion.

3. *The spontaneous utterance.* When Benson found the white powder in the container, Paolino began to "rant," "rave," and "scream" that the substance was baking soda and not cocaine. As noted, the field test of the substance indicated otherwise. In any event, the defendant claims that the judge erred in refusing to allow Benson to relate Paolino's statement to the jury. He claims that the statement was a spontaneous utterance and, therefore, admissible under an exception to the hearsay rule. In light of the circumstances under which the statement was made, we see no error in the judge's ruling. See *Commonwealth* v. *Fuller*, 399 Mass. 678, 682 (1987), and cases therein cited.

---

[2]We learn from the trial transcript that Paolino told the police where the gun could be found only after they bought him a veal cutlet dinner from a local restaurant, promised not to charge him with possession of a handgun, allowed him to make a telephone call, and agreed to wait fifteen minutes before going with him to retrieve the gun.

As for the claim that the judge "prohibited" evidence of statements by Paolino to Benson that the cocaine and the pouch in the car were Paolino's, the defendant is simply wrong. There was nothing to suggest that Paolino ever made any such statements to Benson. Rather, it was defense counsel's position that one could infer from the fact of Paolino's ranting and screaming that the cocaine and bag were his. To this argument, the judge stated that Benson could be asked about Paolino's demeanor but he would not allow hearsay statements until he knew what they were and could rule on the basis of their content. Toward that end, he allowed a voir dire examination of Benson. During that hearing, Benson stated that the only statement made by Paolino was that the substance was baking soda. The judge did not allow that statement, but neither did he preclude inquiry of Benson concerning Paolino's demeanor and behavior at the time of his arrest.

4. *Impeachment of the defendant's credibility.* Testifying on his own behalf, the defendant stated that he had never possessed any large amounts of cocaine. He was a user of that drug and had purchased it from Paolino, as well as others, in the past. On the night in issue, he met Paolino in a bar to buy some cocaine for himself and for a friend. Because he had just cashed his paycheck and his friend had given him money for his cocaine, he was carrying a fair amount of cash, $420 in American and $175 in Canadian currency (the latter from a friend).

When it came time for the defendant to leave the bar, Paolino agreed to give the defendant a ride to where he wanted to go. First, however, Paolino had to stop at his girlfriend's house at 162 Prospect Street in Waltham. Paolino could not have been in the house more than thirty seconds before he returned to the car and told the defendant that there were detectives watching him. The defendant had no idea what was happening.

It was not until Paolino became agitated and began screaming that he did not want to get caught with drugs that the defendant noticed the canvas bag on the floor of the front

seat. Being "no fool," the defendant realized that there must have been drugs in the bag, even though he had no idea of the amount. Because Paolino was yelling at him to throw the bag out the window, he did not have time to open it and see what was in it.

After impeaching the defendant's credibility with evidence of his numerous larceny convictions, the prosecutor turned his attention to the chase and the defendant's testimony that he had not noticed the bag in the front seat earlier, that it was not his, and that it was the only object which he threw from the car during the pursuit. He testified that he had been unaware of the bag until Paolino began yelling about it, because a Cadillac is a big car. Although he recognized some of the items found by the police in the woods as being his, he had no idea how they got there.

The prosecutor next directed his attention to the defendant's testimony that he was a mere user of cocaine and had never possessed it in any great amount. Without objection, the prosecutor directed the defendant's attention to his arrest in June, 1988, for possession of a "considerable" amount of cocaine and his "testimony" that he had been transporting it for Paolino. Denying that he had made the statements described by the prosecutor, the defendant explained that he had possessed cocaine on that date, he would not call the amount "considerable," and he had not been carrying or selling it for Paolino. Rather, he had obtained the cocaine from Paolino for another user in exchange for which he was "getting a piece" of the cocaine for his own consumption.

The sole argument now with respect to the defendant's impeachment is that the use of his prior conviction for possession of cocaine with intent to distribute was so prejudicial, while lacking in any probative value, that it created a substantial risk of a miscarriage of justice. We do not agree. See *Commonwealth* v. *West*, 312 Mass. 438, 440 (1942); *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986).[3]

---

[3]Because the defendant makes no argument on appeal that the questions were precluded by Mass.R.Crim.P. 12(f), 378 Mass. 870-871 (1979), and because the transcript does not reveal when the defendant made these

5. *The prosecutor's closing argument.* In his closing argument to the jury, the prosecutor stated that the defendant threw a gun from the car during the chase. The defendant argues that this remark was an "outrageous" misstatement of the evidence. The claim seems to be based upon the fact that, although the gun was found in the exact place to which Paolino brought the police, it was far off the route of the chase.

We see no merit in the defendant's claim. The detectives testified at trial that they saw Paolino get into the car with a gun and that the defendant, known to the detectives as having possessed weapons, threw a gun out the car window. The defendant testified that Paolino did not have a gun, that he, the defendant, threw only the bag from the window, and that he was a mere user innocently caught up in Paolino's drug trafficking.

That the gun was ultimately found in a brown bag in bushes near the house of Paolino's mother does not support the claim that the prosecutor misstated the evidence. The defendant overlooks the additional evidence that the police looked for the gun for over two days before promising Paolino that, if he would tell them where they could find it, they would not prosecute him for handgun violations. Even then, Paolino insisted upon making a telephone call and told the police they would have to wait fifteen minutes before he would take them to the spot where they could retrieve the weapon. Note 2, *supra.* The inferences are obvious and fair, as was the prosecutor's reference to the gun and the defendant's actions relative to it. See *Commonwealth* v. *Earltop,* 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring).

6. *The jury instructions.* Brought under G. L. c. 94C, § 32E(*b*) (1988 ed.), the indictment charged the defendant with possession of a "net weight of one hundred grams or more of cocaine or any salt thereof or any *mixture* containing cocaine or any salt thereof" (emphasis supplied). The

---

prior statements which were inconsistent with his testimony at trial, we have considered his claim on the narrow basis presented. But see *Commonwealth* v. *Lewin (No. 2),* 407 Mass. 629, 630 (1990).

"one hundred grams or more" came from the two bags found in the woods, one weighing 26.22 grams (78% pure cocaine) and the other 22.47 grams (67% pure cocaine), and the substance in the container found in the car, 84.62 grams.

Because the substance weighing 84.62 grams assayed at less than one per cent cocaine, the defendant argues that the jury should not have been allowed to consider it. The issue does not come to us from a ruling on a motion to dismiss or a request for a required finding of not guilty.[4] Rather, the defendant's argument is based upon the judge's jury instruction, to which no objection was taken: "Under the laws of the Commonwealth, the weight of a drug includes the weight of the drug plus the weight of any impurity or any mixing ingredient." This instruction is a correct statement of the law. See *Commonwealth* v. *Beverly*, 389 Mass. 866, 868-869 (1983).

There is a spin to the argument, however, most likely because of the procedural posture in which it is made. The claim is as follows. As applied to him, there is an "unconstitutional ambiguity in the word 'mixture' in the statute [§ 32E(*b*)]." *Id.* at 869. That being so, he argues, the jury instruction presents a substantial risk of a miscarriage of justice. We pass over the procedural aspects of the claim and conclude that the instruction was correct and applicable to the defendant.

The defendant has not argued that the substance is not a mixture. See, e.g., *Chapman* v. *United States*, 111 S. Ct. 1919 (1991). Instead, he notes that in *Commonwealth* v. *Beverly*, 389 Mass. at 868, the "powder was 3% heroin and 97% an inert substance," whereas here "neither the inert material nor the drug itself is measurable." Building upon that distinction, he claims that because neither component of the mixture is measurable, the statute did not give him constitutionally sufficient notice that the mixture was an illegal

---

[4] The only semblance of a request for a required finding of not guilty came in the form of the statement, "The usual motions, your Honor." The request was denied, and the defendant does not argue that the denial was erroneous. Appellate counsel did not represent the defendant at trial.

substance. Hence, as applied to him, the word "mixture" is unconstitutionally vague.

"[A] statute does not fail to satisfy constitutional requirements merely because it uses general terms when such terms so define the offense as to convey to a person of ordinary understanding and intelligence an adequate description of the prohibited act." *Jacquith* v. *Commonwealth*, 331 Mass. 439, 442 (1954). Section 32E(*b*) could not be more clear in its language: a "net weight of fourteen grams or more of any mixture containing a controlled substance." See *Opinions of the Justices*, 378 Mass. 822, 827 (1979), cited in *Commonwealth* v. *Beverly*, 389 Mass. at 869.

There was evidence to show that the 84.62 grams of powder was a substance comprised of two detectable components, baking soda and cocaine. It was, therefore, a mixture within the common understanding of the word. There was also evidence to show how that substance came to be a mixture rather than retain its original form of pure baking soda.

Detective Benson testified that the substance was, in his opinion, "predominantly the cutting agent" to be used with the two bags of cocaine found in the woods. Cocaine of that purity (67% and 78%), Benson explained, if it is to be ingested by smoking, is cut with baking soda. He described the process. The cocaine is mixed with baking soda on a plate. The substance to be sold is then heated in water, generally in a test tube, until a rock is formed. The rock is removed, sold, and smoked. The substance which was not put in the heating vessel, the baking soda with its traces of cocaine from the cutting, and which remained on the plate, is returned to the supply of the cutting agent, here the baking soda, for further use.

It is by this process that a supply of once pure baking soda becomes a mixture of baking soda and cocaine. Benson also testified that in his experience in drug investigations, he had seen percentages of cocaine in substances for "street sales," (sales to consumers where there is to be no further cutting as with sales between dealers) with ranges from as low as one percent.

One reasonably could infer from the evidence concerning this process that what once might have been pure baking soda becomes a mixture after a single use of it in cutting cocaine and that the more the mixture is used, the more the cocaine component increases. We do not view the term "mixture" as vague simply because the amount of cocaine was not measurable. Nor do we view the word "mixture," as applied to this defendant, as providing him with insufficient notice that his conduct was criminal. "In short, the constitutional burden imposed by the vagueness doctrine requires simply that the statute be drafted in such form as to present 'ascertainable standards of guilt.' *Winters* v. *New York*, 333 U.S. 507, 515 (1948). *United States* v. *Herrera* 584 F.2d 1137, 1149 (2d Cir. 1978). The fact that close questions may arise in determining guilt does not render the statute unconstitutionally vague. *United States* v. *Douglass*, 579 F.2d 545, 548 (9th Cir. 1978)." *Opinion of the Justices*, 378 Mass. at 827. The substance in issue was not a "mixture" because of the presence of an unintentional impurity. Rather, the substance became a "mixture" because a controlled substance, cocaine, was knowingly and intentionally added to the baking soda for purposes of drug trafficking. Compare *id.* at 826 n.3 ("A law may also be judged void for vagueness if 'it encourages arbitrary and erratic arrests and convictions.' *Papachristou* v. *Jacksonville*, 405 U.S. 156, 162 [1972]").[5]

It follows that, as the jury instruction was a correct statement of the law, which as applied to the defendant was not unconstitutionally ambiguous, his conviction does not present a substantial risk of a miscarriage of justice.

*Judgment affirmed.*

---

[5]We do not suggest that a mixture of any weight containing a trace of a controlled substance would in and of itself support an inference of possession *with intent to distribute.* See, e.g., *Commonwealth* v. *Wooden*, 13 Mass. App. Ct. at 422-424, and cases therein cited.