Neel, J.
Defendant Alexander G. Joshua (“Joshua”) is charged with trafficking in cocaine. He moves, pursuant to Article 14 of the Massachusetts Declaration of Rights and the Fourteenth Amendment of the United States Constitution, to suppress all evidence obtained, whether tangible or intangible, as a result of a warrantless search of his car, and any evidence obtained as a result of the allegedly unlawful search and seizure. At the hearing on the motion, the Commonwealth presented the testimony of Detective Stanley J. Gedaminsky. For the reasons set forth below, the motion to suppress is allowed.
FINDINGS
On the basis of the credible testimony of Detective Gedaminsky and the inferences reasonably drawn therefrom, I find as follows.
Detective Gedaminsky has been with the Cambridge Police Department since June 1987, and with the Vice/Narcotics Unit since November 1989. On February 3, 1994, he began his shift at 4:00 p.m. At that time he and other officers were informed at the station by Detective Sergeant Michael Walsh that Joshua was a suspect in a reported unarmed robbery in Belmont the previous night. According to the report, received from Belmont police, the victim was a friend or girlfriend of Joshua, and had stated that Joshua had taken a gold chain from her neck. The victim was also reported to have stated that Joshua was driving a small blue car, and had a sawed-off shotgun, a police scanner tuned to the Cambridge police scanner frequency, and cocaine. None of those items was reported to have been involved in the robbery itself. Finally, Detective Sergeant Walsh reported that “he thought” that Belmont police were in the process of obtaining warrants for Joshua’s arrest.
At about 2:00 a.m. on February 4, 1994, toward the end of the same shift, Detective Gedaminsky and his partner, in plainclothes, were in their unmarked cruiser on patrol in the Central Square area of Cambridge. That area accounts for a disproportionate number of major drug arrests, particularly after dark. As they drove on Massachusetts Avenue, Detective Gedaminsky saw Joshua, whom he recognized from earlier drug arrests, leave a motor vehicle which was double parked on the other side of Massachusetts Avenue, in front of HiFi Pizza. After recognizing Joshua, who walked into the pizza shop, Detective Gedaminsky noticed that the vehicle was a small blue Oldsmobile.
Detective Gedaminsky called other units over the police radio, stated that he had spotted the defendant, and asked them to call Belmont police to determine whether any arrest warrants had issued for defendant. In the meantime, the detective and his partner continued to observe the blue Oldsmobile, turning their cruiser around and driving up behind it.
Less than a minute after he had entered the pizza shop, Joshua emerged cariying a slice of pizza on a plate and heading for the driver’s side of the blue car. Detective Gedaminsky and his partner, now a block or so behind Joshua’s vehicle, did not see any other police officers or cruisers, and were concerned that Joshua was about to drive away. They drove up and parked directly behind Joshua’s car. They did not see Joshua, a large man in a small car, make any particular movements. They had not at that time seen Joshua commit any crime, and thought only that he might be wanted by the Belmont police.
Detective Gedaminsky walked to the driver’s side of Joshua’s vehicle. As he reached the door, two uniformed police officers in a marked cruiser pulled up in front of Joshua’s car. At that time Detective Gedaminsky heard the Cambridge Police dispatcher’s voice come from within the Joshua car, and concluded that Joshua had a police scanner tuned to the Cambridge police radio frequency. The detective at that time believed that, with confirmation that Joshua had a scanner tuned to the Cambridge police frequency, Joshua may also have a shotgun or other weapon in the car.
Detective Gedaminsky asked Joshua and his passenger, Keith Moore, to step out of the car and to keep their hands in view. They complied, and the two detectives took Joshua and Moore to a position about two paces to the rear of Joshua’s car, where the two were pat-frisked. Police found no weapons. Joshua and Moore were cooperative, made no suspicious movements, and made no move to return to their car. By this time, a total of seven or eight uniformed officers had arrived at the scene. While he was being frisked behind his car, Joshua did not have access to the car. After the frisk, Detective Gedaminsky returned to Joshua’s car. Joshua remained in place, and did not try to re-enter it. At this time Detective Gedaminsky had not determined whether, while waiting to hear whether Belmont police had obtained a warrant for Joshua, he would place Joshua back in his car or not. *642 He thought that if Joshua were allowed to move, he would “probably” get back into his car.
The detective looked in the passenger side, saw no shotgun or other weapon, retrieved a Radio Shack police scanner from the inside, then went to the driver’s side. There he swept his hand under the driver’s side seat in search of any gun or other weapon, and pulled out a brown paper bag of the type used to hold submarine sandwiches. He could see a large amount of plastic sticking out of the bag, and a knot in the plastic. On the floor in front of the driver’s seat he saw cellophane wrap in a ball, paper, and a cup.
Detective Gedaminsky believed at this time that the brown bag contained cocaine, based on his knowledge of the way the drug is packaged. He removed from the brown bag a plastic bag in which were two large rocks of what turned out to be cocaine. Joshua and Moore were then arrested. At no time did Detective Gedaminsky ever learn whether a warrant had been issued by Belmont police for Joshua. No shotgun was found in a subsequent search of the trunk of Joshua’s car.
DISCUSSION
Defendant characterizes the initial police encounter with defendant as an arrest, and claims that the police did not have probable cause to arrest him at the time of the encounter. The Commonwealth admits that there was a seizure of the defendant followed by a search, but characterizes the encounter as a stop pursuant to a threshold inquiry and does not claim that the police had probable cause for an arrest.
The court will first determine whether there was sufficient justification for the police to stop defendant, and will then consider whether the encounter was a stop, rather than an arrest. See Commonwealth v. Willis, 415 Mass. 814, 817-18 (1993) (similar analysis where no claim of probable cause). If the encounter amounted to an arrest without probable cause, then the results of the search of the car would be suppressed even if a protective search would have been justified based on reasonable suspicion. See Commonwealth v. Bottari, 395 Mass. 777, 782, 785 (1985). If the encounter was a threshold inquiry, as the Commonwealth claims, then the remaining issue is whether the subsequent search of the car was reasonable under the circumstances.[1]
A. JUSTIFICATION FOR STOPPING DEFENDANT
Police may stop a suspect in order to conduct a threshold inquiry if they have a reasonable suspicion, based on specific, articulable facts, that the defendant had committed, was committing, or was about to commit a crime. Willis, 415 Mass. at 817. If the police conduct a stop based on an informant’s tip, the tip’s reliability will be judged in terms of the informant’s reliability and his or her basis of knowledge, id. at 818. Independent police corroboration may make up for deficiencies in one or both of these factors. Id. Corroboration can reveal special familiarity with the defendant’s affairs that might substitute for explicit information about the basis of the informant’s knowledge. Commonwealth v. Carrasquillo, 30 Mass.App.Ct. 783, 787 (1991). The Supreme Judicial Court has rejected the “totality of the circumstances test” relied upon in Alabama v. White, 110 S.Ct. 2412 (1990), as “unacceptably shapeless and permissive.” Commonwealth v. Lyons, 409 Mass. 16, 18 (1990). Corroboration of only nonincriminating details from an anonymous tip is insufficient to establish reasonable suspicion. Id. at 21 n.5, 22. Because the standard is reasonable suspicion rather than probable cause, a less rigorous showing of the informant’s reliability and basis of knowledge is permissible. Id. at 19.
Where the police rely on a flyer or bulletin from another police department or a radio broadcast, the police who issued the flyer, bulletin, or broadcast must possess sufficient information to justify the threshold inquiry. Willis, 415 Mass. at 818; Commonwealth v. Fraser, 410 Mass. 541, 546 (1991). The Commonwealth bears the burden of presenting evidence that the broadcast was based on reliable information, regardless of whether the details of the broadcast are independently corroborated. Commonwealth v. Antobenedetto, 366 Mass. 51, 57 (1974); see Commonwealth v. Cheek, 413 Mass. 492, 495 (1992) (Commonwealth must present evidence on the factual basis for the radio call in order to establish its indicia of reliability); Fraser, 410 Mass. at 546 (Commonwealth failed to provide any evidence indicating officer issuing radio call had sufficient information); cf. Commonwealth v. Andrews, 34 Mass.App.Ct. 324, 328 (1993) (Commonwealth provided evidence that officer responsible for broadcast had reasonable suspicion based on specific and articulable facts). But see Willis, 415 Mass. at 819 (independent corroboration of portions of the information can provide a “sufficient but ‘less rigorous showing’ ” that information is reliable).
In Antobenedetto, police stopped a car occupied by “known drug users and suspected bad check passers” after receiving a radio report that two young men had attempted to pass a bad check and had departed in a car with a matching description and license plate. 366 Mass. at 52. The evidence was suppressed, in spite of corroboration of details of the report, because the Commonwealth failed to present evidence, “easy to supply if it exist[ed],” that the originator of the report had reliable information. Id. at 57-58.[2]
In Fraser, a radio broadcast about a man with a gun in a brown Toyota did not, by itself, provide the reasonable suspicion required for an officer to conduct a protective frisk of a young man who was not in a Toyota, because there was no evidence indicating that the officer who issued the broadcast had any reliable information about the young man. 410 Mass. at 546. However, the radio broadcast was a factor which taken *643 together with other factors were sufficient to justify the search. Id.
In Willis, a search pursuant to a stop was upheld even though the Commonwealth failed to present evidence of the basis of the information that led to the stop. Boston police received information via teletype from a Michigan police department, based on information furnished by an undisclosed informant. 415 Mass. at 818. The detailed nature of the teletype, which included the approximate time the suspect would arrive in Boston by bus, a description of the defendant and of a distinctively striped pillowcase he was carrying, the serial number of the gun he carried, the name of its registered owner, and the location from which it had been taken, went a “long way” toward showing the informant’s basis of knowledge. Id. at 818-819. When the suspect arrived at the predicted time, carrying a striped pillowcase, there was a sufficient showing that the information was reliable, warranting a reasonable suspicion. Id. But see id. at 822 (Liacos, J., dissenting) (police did nothing for four hours to verify teletype when another call or two might have yielded information sufficient for search warrant).
In this case, the defendant claims that the Cambridge police did not possess sufficient information to justify stopping him, because only innocent details were corroborated and the officer’s prior knowledge of defendant’s drug dealing was irrelevant. (Defendant’s Memorandum in Support of Motion to Suppress Evidence at 10.) However, the officers did not stop defendant because they suspected that he was committing or was about to commit a crime, they stopped him because they believed that the Belmont police department may have issued a warrant for his arrest. See Adams v. Williams, 407 U.S. 143, 146 (1972) (police may stop individual to check identity or maintain status quo while obtaining more information). While there may have been an inconsistency between one officer’s testimony and another officer’s report concerning the basis of the information from the Belmont police,[3] it is not necessary that the officers know the factual basis of that report at the time they make the stop. See Antobenedetto, 366 Mass. at 58 (police entitled to act on strength of radio bulletin); Commonwealth v. Crowley, 13 Mass.App.Ct. 915 (1982). What is necessary is that the Commonwealth provide, at the proper time, evidence “that the originator of the . . . communication . . . had reliable advice on the occurrence of a crime.” Antobenedetto, 366 Mass. at 57.
The Commonwealth has failed to provide any direct evidence about the basis of the Belmont police department’s information. The only officer to testify at the motion hearing had no direct contact with the Belmont police regarding this matter, and received all of his information from a Cambridge police department detective who did not testify at the motion hearing. The Commonwealth did not provide any testimony from Belmont police personnel concerning the source of their information, and did not attempt to show that the Belmont police had obtained an arrest warrant.
The facts of this case are thus similar to those in Antobenedetto: while it is possible to infer that both reports were based upon information supplied by a victim, in neither case was there evidence that the person who supplied the information was a victim or had “reliable advice on the occurrence of a crime.” See 366 Mass. at 57. Moreover, this case can be distinguished from Willis, where the court was willing to accept a “less rigorous showing” because the information supplied to the police, including the serial number and owner of the gun and the place from which it was taken, demonstrated the informant’s basis of knowledge. 415 Mass. at 818-19. Here, there are no specific, proven facts to make even a “less rigorous showing”; the Belmont police report of the color of defendant’s car and his possession of a police scanner show no basis of knowledge of the circumstances of an alleged unarmed robbeiy.
The Commonwealth has simply failed to provide evidence “easy to supply if it exists,” Antobenedetto, 366 Mass. at 58,[4] and therefore has failed to meet its burden (see also id. at 72 (Hennessey, J., dissenting in part) (it is especially important that the report be corroborated where the crime proved is not the one which was broadcast)).
Because the Commonwealth has failed to meet its burden of showing the basis upon which the bulletin was issued, it has not proven that the officers possessed a reasonable suspicion sufficient to justify the stop and threshold inquiry of defendant. The evidence must, therefore, be suppressed;
B. THE NATURE OF THE ENCOUNTER
Defendant in this case claims that he was under arrest when he was ordered out of his car. (Defendant’s Memorandum at 6.)[5]
An encounter between the police and a suspect may amount to an arrest, rather than a “stop,” even if the police do not make a formal arrest, “fflhere is no magic in the word ‘arrest’. . .” Commonwealth v. Sanderson, 398 Mass. 761, 766 (1986), quoting Commonwealth v. Wallace, 349 Mass. 9, 16 (1963). In order for a person to be “arrested, there must be [1] an actual or constructive seizure or detention of the person, [2] performed with the intention to effect an arrest and [3] so understood by the person detained.” Commonwealth v. Cook, 419 Mass. 192, 198 (1994) (quoting Massachusetts Gen. Hosp. v. Revere, 385 Mass. 772, 778 (1982), rev’d on other grounds, 463 U.S. 239 (1983), quoting Hicks v. United States, 382 F.2d 158, 161 (D.C. Cir. 1967)); see also California v. Hodari, 499 U.S. 621, 624-26 (1991) (mentions seizure and “purpose to arrest” but omits mention of arrestee’s understanding).
*644 A number of courts have criticized the use of subjective intent in the definition of “arrest.” See Horton v. California, 496 U.S. 128, 138 (1990) (evenhanded law enforcement best achieved by application of objective standards rather than standards that depend upon subjective state of mind of officer); Berkemer v. McCarty, 468 U.S. 420, 442 (1984) (policeman’s un-articulated plan has no bearing on whether suspect is “in custody”); Commonwealth v. Shine, 398 Mass. 641, 648 (1986) (intent to arrest not a factor in determining whether there is “in-custody” questioning). However, the difficulty with a purely objective standard is that it does not serve to distinguish an arrest from an investigatory stop. Commonwealth v. Borges, 395 Mass. 788, 792 n.3 (1985). While the subjective intent of the officers is not controlling, it is of some relevance, particularly where the court finds that the actions of the officers demonstrates an impermissible intention. See Sanderson, 398 Mass. at 766 n.9, 767 (court inferred officers’ purpose was to search for contraband); Commonwealth v. Stawarz, 32 Mass.App.Ct. 211, 213 n.4 (1992) (court rejected officer’s testimony that purpose was to ascertain whether vehicle was stolen).
It is clear, and the Commonwealth does not deny, that in this case defendant was seized when he was ordered out of his car. Cf. Commonwealth v. Moses, 408 Mass. 136, 141 (1990) (by taking car keys police exerted complete control and created impression that suspect was not free to leave). There was credible testimony from Detective Gedaminsky that his purpose was to detain defendant in order to inquire into the existence of an arrest warrant, and there was no evidence that the officers intended to arrest defendant in the absence of a warrant. See Sanderson, 398 Mass. at 766 n.9 (according to Massachusetts Gen. Hosp., arrest must be performed with intent to effectuate arrest). While defendant was not arrested in the Massachusetts Gen. Hosp. sense, the undisclosed intentions of the officers are not controlling, and the court looks to the circumstances of the encounter to determine whether it was the equivalent of an arrest. See Cook, 419 Mass. at 198.
An encounter may be the functional equivalent of an arrest if the means employed to detain a suspect are inconsistent with the limited purpose of a brief Terry-type investigative stop “to determine [the defendant’s) identity or to maintain the status quo momentarily while obtaining more information.” Sanderson, 398 Mass. at 767, quoting Adams v. Williams, 407 U.S. at 146. The scope of the seizure must be strictly tied to and justified by the circumstances which rendered its initiation permissible, Terry v. Ohio, 392 U.S. 1, 19 (1968), must be temporary and last no longer than is necessary to effectuate the purpose of the stop, Florida v. Royer, 460 U.S. 491, 500 (1983), and should use the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time, id. “Terry and Royer state a ‘principle of proportionality.’ [citations omitted). The degree of intrusiveness . . . must be proportional to the degree of suspicion that prompted the intrusion.” Borges, 395 Mass. at 794; see also Willis, 415 Mass. at 819 (no bright line test but rather proportional relationship between degree of intrusion and degree of suspicion).
The degree of intrusion is considered in light of the degree to which the defendant’s movement is restrained, the degree of force used by the police, and the extent of the intrusion. Specific factors the court should consider include the length of the encounter, the nature of the inquiry, the possibility of flight, and, most important, the danger to the safety of the officers or the public. Id. at 819-20. The police are entitled to take reasonable precautions for their protection. Id. at 820. Whether the force used by the police is justified depends upon the extent of the danger at the time force is used. Depending upon the circumstances, the police may approach a suspect with guns drawn and superior force, and may block escape or otherwise leave the impression that the suspect is not free to leave. Id.; Moses, 408 Mass. at 141, 143 n.6 (blocking automobiles generally reasonable due to chance suspect may flee and represent danger to officers and public).[6]
The following cases illustrate the way Massachusetts courts have weighed factors bearing on the degree of intrusion in light of the degree of suspicion.
In Willis, the police, who did not testify that they feared for their safety, outnumbered the suspect and approached him with their guns drawn (but not pointed at him). 415 Mass. at 820. The encounter was a stop, and not an arrest, because “[c]onstitutional principles do not require the police to approach a person who is reasonably suspected of being armed with a loaded, stolen handgun and reasonably believed to have engaged in violent criminal conduct without taking precautions . . .” Id. at 821. But see id. at 823-24 (Liacos, J., dissenting) (court should not have inferred fear from testimony and should have found knowledge of prior convictions to be insufficient by itself).
In Moses, the police exerted complete control over the defendants by ordering the surrender of their car keys, by partially blocking their car’s path, and by creating a reasonable impression that they were not free to leave. 408 Mass. at 141-42. The encounter was a stop, not an arrest, because the officer was initially outnumbered by the suspects, because the officer reasonably suspected that the defendant’s movements were an attempt to conceal a weapon, and because the police were justified in anticipating an attempt by the suspects to flee, resulting in danger to the public, the police and the suspects themselves. Id. at 142-43.
In Commonwealth v. Bottari, 395 Mass. Ill (1985), the court held that the police effectively arrested a suspect, even though they did not use the word “arrest,” when they blocked the suspect’s automobile, *645 immediately drew their guns, ordered the occupants out of the automobile, and had them place their hands on the roof of the automobile. Id. at 779, 782. The encounter exceeded the scope of a Terry-type investigative stop because the use of force was not precipitated by any actions of the suspects, the police did not testify that they feared for their safety, and there were no other fear-provoking circumstances, beyond the suspicion that one of the occupants might have had an illegal gun. Id. at 782, n.5 (distinguishing Commonwealth v. Ballou, 350 Mass. 751 (1966), cert. denied, 385 U.S. 1031 (1967), based on police knowledge, independent of the informant’s tip, of dangerousness of suspect).
In Sanderson, the police did not use force; however, they blocked the suspect’s vehicle, outnumbered him six (plus a dog) to one, made it clear that he was not free to leave, and detained him for forty minutes before arresting him. 398 Mass. at 766-67. The absence of force was not decisive because the police never received any information indicating that the defendant carried weapons or posed a threat to the officers. Id. at 767 n. 10. The encounter was an arrest because the manner in which it unfolded demonstrated that the police “detain[ed] the suspect for purposes of making a search for contraband”; the means employed went beyond what was necessary to question a suspicious person. See id. at 767.
The circumstances defendant points to in claiming that the stop was the equivalent of an arrest include the number of vehicles that surrounded defendant’s vehicle, the number of officers on the scene, the officers’ order that the occupants leave defendant’s vehicle, the intent of the officers to prevent defendant from leaving the scene, and the alleged intent of the officers to seize the car to search for drugs. (Defendant’s Memorandum at 5-6.)
At the time the officers first approached defendant’s car, they were aware of defendant’s previous arrest on drug charges, had information from the Belmont police that defendant possessed a sawed-off shotgun, and were apprehensive about their ability to detain defendant due to his size. Detective Gedaminsky’s request for backup assistance was reasonable under the circumstances, because there was some reasonable basis for him to fear for his safety, see Willis, 415 Mass. at 820 (police entitled to take precautions), and the presence of additional officers was a relatively unintrusive means of ensuring that defendant did not leave the scene while the warrant check was performed, see Royer, 460 U.S. at 500 (must be least intrusive means to accomplish purpose).
Defendant was not ordered out of his vehicle until after Detective Gedaminsky heard the police scanner, tuned to the Cambridge police frequency as predicted by the information from the Belmont police. Corroboration of this portion of the report from the Belmont police reasonably increased the officers’ concern for their safety because it increased the possibility that defendant was in possession of the sawed-off shotgun. At this point, additional officers had not yet arrived. Cf. Fraser, 410 Mass. at 546 (officers outnumbered). It was, therefore, reasonable under the circumstances for the officers to order defendant and his passenger out of the vehicle. See Moses, 408 Mass. at 142 (officer approaching car unable to see whether occupant’s movement indicates he is concealing or drawing gun). For the same reasons, the officers had a reasonable fear for their safety that justified a pat frisk of defendant to search for other types of weapons.[7]
Shortly after defendant left his vehicle, additional officers began arriving on the scene and blocked defendant’s vehicle with their cruisers. See id. at 143 n.6 (blocking reasonable). At this point, the act of blocking defendant’s car represented no greater additional intrusion than would have occurred if the officers had taken the keys to defendant’s vehicle. See id at 142. The presence of seven or eight officers may have appeared to be out of proportion in the context of an ordinary identity check. See Stawarz, 32 Mass.App.Ct. at 214 (surrounding suspected stolen vehicle with four or five cruisers and eight to ten officers was substantial and perhaps extravagant force).[8] However, the detectives believed that there was a good chance that they would have to place defendant in custody; the presence of additional officers was therefore a reasonable precaution to deter resistance on the part of defendant, reducing the likelihood that the officers would have to resort to physical force if they were to arrest him. See Willis, 415 Mass. at 820 (police are entitled to take reasonable precautions for their safety).
Defendant claims that the subjective intention of the police to restrict defendant’s movements is relevant to the question of whether an arrest has taken place. “A complete restriction on liberty of movement occurs in the typical investigatory stop,” Borges, 395 Mass. at 792 n.3, and, therefore, the subjective intention of the police to restrict defendant’s movement does not prove that an arrest has taken place. Defendant also claims that the police seized his car with the intént to search it for drugs; however, this claim is contradicted by testimony, accepted by the court, that the detectives’ purpose in detaining defendant was to perform a warrant check.
Because the means used to detain defendant were proportionate to the reasonable safety concerns of the detectives, the encounter was a valid threshold inquiry and not an arrest. Accordingly, lack of probable cause to arrest does not require suppression of evidence seized from defendant’s car.
C. REASONABLENESS OF THE SEARCH
The reasonableness of a search incident to a threshold inquiry is measured not against the governmental interest that justified the inquiry, but against the officer’s interest in ”assur[ing] himself that the person *646 with whom he is dealing is not armed.” Terry, 392 U.S. at 23. Where an officer has a right or an obligation to confront, rather than avoid, a person he considers dangerous, “(t]here is no reason why [that] officer . . . should have to ask one question and take the risk that the answer might be a bullet.” Terry, 392 U.S. at 33 (Harlan, J., concurring); Commonwealth v. Almeida, 373 Mass. 266, 271 (1977); Commonwealth v. Tompert, 27 Mass.App.Ct. 804, 807 (1989); see also Willis, 415 Mass. at 821 (police not required to ignore teletype message).
Unlike a search incident to an arrest, a search incident to a threshold inquiry “is not justified by any need to prevent the disappearance or destruction of evidence of crime.” Terry, 392 U.S. at 29. Accordingly, the search “must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.” Id. at 26. The state bears the burden of showing that “the investigative methods employed [were] the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time.” Royer, 460 U.S. at 500; Robbins, 407 Mass. at 151 (Commonwealth bears burden of proving reasonableness); see also Borges, 395 Mass. at 793 n.5 (1985) (quoting Royer, 460 U.S. at 511 n. (Brennan, J., concurring)) (“lawful stop must be so strictly limited that it is difficult to conceive of a less intrusive means that would be effective”). Evidence discovered by means that are not reasonably related to the officer’s safety interest is inadmissible. Terry, 392 U.S. at 29.
In evaluating the reasonableness of a protective search, the court will examine all the circumstances faced by the officer to determine whether, taken together, they warrant the belief by a reasonably prudent person that his safety or that of others is in danger. Commonwealth v. Johnson, 413 Mass. 598, 600 (1992). “Due weight must be given, not to his inchoate and unparticularized suspicion or ‘hunch,’ but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.” Terry, 392 U.S. at 27; see also Johnson, 413 Mass. at 601.[9]
The conduct of the suspect in the circumstances leading to or following the stop may contribute to the justification of a search for weapons. See, e.g., Johnson, 413 Mass. at 601 (suspect seen reaching for waist area of pants after high speed chase in which suspect almost struck unmarked vehicle); Fraser, 410 Mass. at 545 (suspect bent down behind truck, as if picking something up or putting something down, and then confronted officer with hands in his pockets); Moses, 408 Mass. at 144 (suspect appeared to conceal something below dashboard); Almeida, 373 Mass. at 271-72 (suspect sitting alone in car with engine running offered no explanation for parking in private space, opened cover of console only enough to get hand in and remove wallet, did not immediately produce vehicle registration, and twisted in seat at a time when policeman could not observe his hands); Silva, 366 Mass. 402, 407 (1974) (suspect made a gesture as if to conceal something in his automobile); Rivera, 33 Mass.App.Ct. 311, 315 (1992) (passenger looked around when flashers turned on, bent forward as if to place something on floor, and placed in his lap a boom box which might have concealed a weapon); Crowley, 13 Mass.App.Ct. at 915 (suspect made no threatening gesture or suspicious movement while officer searched suspect’s companion).
The location and time of the stop as well the number of officers involved can contribute to an officer’s reasonable fear for his safety. See e.g. Fraser, 410 Mass. at 546 (officers outnumbered in high crime area); Almeida, 373 Mass. at 271 high crime district late at night); Silva, 366 Mass. at 407 (incident occurred at night in an isolated area); Rivera, 33 Mass.App.Ct. at 315 (single trooper approaching four men in a car). Information, known to the officers at the time of the stop, that the suspect is armed or has a history of criminal activity that includes violent crimes will justify precautions that might otherwise be viewed as excessive. See, e.g., Willis, 415 Mass. at 816 n.2, 820 (police previously arrested defendant on charges of violent crime and had tip defendant carrying a gun). But see Bottari, 395 Mass. at 782 (fact that officers suspected occupant of car had illegal gun did not justify force without other fear-provoking circumstances).
A Terry search may extend into the interior of an automobile if it is limited in scope to a protective end, and is confined to the area from which the suspect might gain possession of a weapon. Almeida, 373 Mass. at 272. Massachusetts appellate courts have addressed the issue in a number of cases, examples of which follow.
In Almeida, the officer observed what he recognized as a gun holster protruding from beneath the front seat before he swept his hand underneath the seat to bring the holster and a full clip of ammunition into view. 373 Mass, at 272. The suspect was not in the automobile at the time it was searched; however, the search was reasonable in light of the circumstances because the suspect was not under arrest and there was no assurance that he would not be returning to his seat behind the wheel. Id.
In Silva, the court considered the reasonableness of a search under the passenger seat of the car to be a close question because, while the police had already frisked the suspect and the suspect was not in the car, his companion was in the driver’s seat of the vehicle and he was not in the custody of the police and could be expected to reenter his vehicle. 366 Mass, at 408-09. However, the subsequent opening of a three-inch diameter black packet containing heroin went beyond the scope of a protective search. Id. at 410. The packet, weighing no more than two ounces, could not conceiv *647 ably have contained a gun or dangerous weapon of any kind. Id. The search of the packet was clearly a search for evidence rather than a protective search for weapons, and was, therefore, not justified by Terry principles. Id.
In Commonwealth v. Nutile, 31 Mass.App.Ct. 614, 616-17 (1991), the officers saw the driver enter the car with a gun tucked in the waistband of his pants, and observed the passenger throwing objects out the window during a high speed chase. When a frisk of the driver failed to produce the gun, the officers were justified in reaching into a pouch with a bulge hanging from the back of the driver’s seat and removing a round plastic container containing a white powder. Id. at 618. The court did not question the officers’ right to remove the bulging item from the pouch, because they had seen the driver enter the car with a gun, their frisk of the driver revealed that he no longer had the gun, and they had observed the passenger reaching around toward the pouch during the chase. Id. at 618-19.
In Commonwealth v. Vanderlinde, 27 Mass.App.Ct. 1103 (1989), officers ordered the occupants out of a car after a high speed chase, and after the passenger reached into the well between the driver’s and front passenger’s seats. The officer was justified in looking into the well area, where he observed an open brown bag containing a clear plastic bag of cocaine, to see if it contained a gun. Id. at 1104. [10]
In Robbins, a crack cooker was immediately visible on the floor of the car after the officer had opened the door to investigate what he thought was a knife wedged in the front seat. 407 Mass, at 152. Opening the car door in order to determine whether the object was a knife was reasonable because it was limited to a protective end. Id.
In judging the detective’s decision in this case to search defendant’s vehicle, the court must weigh the detective’s safety interests and the additional intrusion represented by the search. See Willis, 415 Mass, at 820 (crucial question is extent of danger at the time). If the detectives had a reason to place defendant back in his vehicle pending the warrant check, or had a reasonable fear that defendant could gain access to the interior of the vehicle, they would be justified in searching the interior of the vehicle for weapons. See Almeida, 373 Mass, at 272.
Detective Gedaminsky testified that defendant was cooperative, did not resist the detectives’ orders to leave the vehicle or to submit to a frisk, and did not attempt to reenter his vehicle. See Bottari, 395 Mass, at 782 (use of force not precipitated by actions of defendants). When the frisk of defendant was finished and Detective Gedaminsky proceeded to the car, the police outnumbered defendant and his passenger by at least seven or eight to two. This margin, while not unreasonable under the circumstances, was sufficient further to reduce the detectives’ reasonable fear for their safety and to raise some question about the necessity of further intrusions. See Sanderson, 398 Mass, at 766-67; Stawarz, 32 Mass.App.Ct. at 214.
Detective Gedaminsky did not testify that he feared that defendant could overwhelm the officers present and gain access to the interior of the vehicle. While the formidable size of defendant could conceivably have raised some concerns about whether the police on the scene could have prevented defendant from reaching the interior of his vehicle, the detective did not express those concerns in his testimony. See Almeida, 373 Mass, at 272; see also Bottari, 395 Mass, at 782 (officers did not testify that they feared for their safety). Detective Gedaminsky also testified that, at the time he returned to the car, had not decided whether he would allow defendant back in his car pending the warrant check.[11] The additional intrusion of the search of defendant’s car cannot be justified based upon something the detective might thereafter decide to do. Had the detective decided, at some later time, to place defendant in the vehicle, he could have initiated a search of the vehicle at that time. See Borges, 395 Mass, at 793 (must use least intrusive means available).
Finally, the detective testified that he looked into the car and did not see a shotgun, and that his search of the interior was for a handgun or other weapon. The court infers from this testimony that the detective did not expect to find a shotgun under the driver’s seat of the “small” blue car and that the reasonable fear for safety, originally heightened by the presence of the scanner, was correspondingly diminished prior to the search of the interior of the vehicle. The court finds that the Commonwealth has not met its burden of showing that the additional intrusion of the search was proportional to the extent of the danger at the time the police initiated the search. See Willis, 415 Mass, at 820. There is insufficient evidence to find that the search was necessary in order for the officers to avoid “gambl[ing] with their personal safety." See id.
Even if it was reasonable for the detectives to initiate a search of the vehicle, the scope of the search was not limited to the “least intrusive means reasonably available" to ensure the officer’s safety. Borges, 395 Mass, at 793 & n.5 (must be difficult to conceive of less intrusive means). A visual inspection of the area under the seat might have been a prudent safety precaution for the detective and might have ruled out the presence of weapons without requiring an examination of other items present under the seat. However, the court is not prepared to say that officers must always perform a visual search, where possible, prior to reaching into an area with their hands. See Nutile, 31 Mass.App.Ct. at 618. But cf. Vanderlinde, 27 Mass.App.Ct. at 1104 (officers justified in looking into well area).
*648 Of greater concern was Detective Gedaminsky’s handling of the brown paper submarine sandwich bag after it was removed from under the seat. Detective Gedaminsky did not testify that he believed the brown bag might contain a weapon. While it is conceivable that a submarine sandwich bag could be large enough to hold a knife or small handgun, there is no evidence of that fact and there is a fair inference to be drawn from other evidence that the weight of the bag was inconsistent with the presence of a weapon. The detective did testify that he observed a large amount of plastic sticking out of the paper bag,[12] and that he observed other items on the floor of the car, including cellophane wrapping in a ball, paper, and a cup, that were suggestive of the presence of cocaine. He also testified that he believed the brown bag contained cocaine. The court finds, based on the detective’s testimony, that his purpose in opening the brown paper bag and examining its contents was to search for contraband, and that he was no longer conducting a protective search. See Terry, 392 U.S. at 29; Sanderson, 398 Mass, at 767.
“The requisite for a search and seizure in this Commonwealth is probable cause,” id., and the Commonwealth has not argued that Detective Gedaminsky had probable cause to search defendant’s possessions for contraband. Because the Commonwealth has not shown that the search of the vehicle was a necessary protective search, and that the scope of the search was reasonably confined to the minimum means necessary for the officers’ protection, it was not a reasonable search pursuant to a threshold inquiry. The evidence will, therefore, be suppressed.
ORDER
For the reasons stated above, the motion to suppress is ALLOWED.

Defendant does not challenge the frisk, apparently because it did not reveal any evidence. Therefore, the court will examine the circumstances surrounding the frisk only to the extent that they have a bearing upon the reasonableness of seizure of the defendant and the search of the car.

The court exonerated the officers, and suggested that the search would have been upheld had the Commonwealth introduced evidence of the basis of the radio report. Id. at 58.

Detective Gedaminsky testified that he thought the report to Belmont police came from the victim; Officer Maffei’s report indicated that an informant was involved.

Because the information in Willis originated in a police department in Michigan, the increased logistical burden of providing the required proof may have been another reason the court was willing to accept a “less rigorous showing” in Willis. See 415 Mass, at 818. The court in Antobenedetto made particular note that the required evidence will normally be easy to supply. 366 Mass, at 58; see also id. at 71-72 (Hennessey, J., dissenting in part) (ruling places no substantial new burden of proof; corroboration in most cases is easily and routinely shown). In this case, obtaining testimony from the Belmont police cannot be viewed as representing a substantial new burden.

The Affidavit of Alexander Joshua in Support of His Motion to Suppress (Defendant’s Affidavit) states that defendant “did not step completely into [his] car and stood up alongside [his] car door,” casting some doubt as to whether defendant was actually ordered out of his car. (Defendant’s Affidavit at 5.) Detective Gedaminsky testified that, as he approached the window on the driver’s side of the vehicle, he heard the police scanner and decided to order defendant and his passenger out of the car. The court credits this testimony, and will assume that defendant was in his car when that order was given.

The police may order the driver and passengers out of a car in order to conduct a justified inquiry. Commonwealth v. Robbins, 407 Mass. 147, 151 (1990). However, once an inquiry is complete, any attempt to order occupants out of a car may be seen as a pretext for an illegal search. See Commonwealth v. Ferrara, 376 Mass. 502, 505 (1978); Commonwealth v. McCleery, 345 Mass. 151, 153 (1962).

Defendant does not challenge the scope of the frisk and introduced no evidence that it went beyond the minimum means necessary for safety purposes; therefore, the court finds that the manner in which the frisk was conducted is not suggestive of an arrest. The court expresses no opinion about whether the frisk of the passenger was reasonable under the circumstances. In addition, the court draws no inferences about the officers’ intentions from the fact that the passenger was frisked.

The Stawarz court states that the “reasonable perception of restraint of freedom” under the circumstances of that case “marks an arrest.” 32 Mass.App.Ct. at 214 (citing Borges, 395 Mass, at 791-93). Borges states that a reasonable perception of restraint marks a seizure, and that the seizure may be the equivalent of an arrest if it is disproportionate to the degree of suspicion. Borges, 395 Mass, at 791-93. Stawarz, applying that standard, concludes that the police intrusion was disproportionate.

Defendant claims that his rights under both the Fourth Amendment to the United States Constitution and art. 14 of the Declaration of Rights of the Massachusetts Constitution have been violated; he has not argued that article 14 provides more protection than does the United States Constitution. There is some suggestion in Cook that there may be a difference between the federal and state definitions of “seizure,” 419 Mass, at 199, and there is some suggestion in Lyons that there is a difference between the federal and state standards for reasonable suspicion, 409 Mass, at 18. However, there do not appear to be any cases in which a Massachusetts court has found a difference in what constitutes a reasonable search, see Fraser, 410 Mass, at 543 n.3; Commonwealth v. Rivera, 33 Mass.App.Ct. 311, 314 n.2 (1992). The court will, therefore, consider the scope of the search as requiring the same justification under both the federal and state constitutions.

It is unclear whether the officer observed the open brown bag and its contents before reaching into the well area or first removed the brown bag from the well area and then observed its contents. Vanderlinde, 27 Mass.App.Ct. at 1104. In any event, the court does not suggest that the officers’ interest in their own safety would have made it reasonable for them to empty the contents of the brown bag in order to determine whether it contained contraband. See Terry, 392 U.S. at 29.

The detective did not testify that the weather was inclement or that the officers or defendant were underdressed for a February night.

The detective’s testimony indicates that the cellophane in the bag was visible “to the knot”; the court infers that no drugs were visible without further examination.