COMMONWEALTH *vs.* CLEVELAND MARTIN.

Suffolk. October 11, 2013. - February 26, 2014.

Present: IRELAND, C.J., CORDY, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Felony-Murder Rule. Robbery. Taxicab. Joint Enterprise. Constitutional Law,* Admissions and confessions, Voluntariness of statement, Search and seizure, Assistance of counsel, Result of illegal interrogation. *Due Process of Law,* Assistance of counsel. *Search and Seizure,* Expectation of privacy. *Evidence,* Joint venturer, Admissions and confessions, Cross-examination, Impeachment of credibility, Prior misconduct, Relevancy and materiality, Result of illegal interrogation. *Practice, Criminal,* Admissions and confessions, Voluntariness of statement, Motion to suppress, Assistance of counsel, Capital case. *Cellular Telephone. Telephone. Witness,* Cross-examination, Impeachment.

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress statements made to police officers and evidence seized following a stop of the defendant, where, given that the words one officer used in addressing the defendant more closely resembled a request to speak with him and ask questions than a command to stop, the judge did not err in concluding that a reasonable person in the defendant's situation would have felt free to leave; and where the subsequent search of the defendant's cellular telephone was permissible in that the defendant had abandoned it and had no expectation of privacy in it. [301-304]

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress statements made to police detectives when they interrogated him in a jail in Virginia, where the defendant's waiver of the Miranda rights was valid, in that the detectives (who informed the defendant that a lawyer had contacted the police and had stated that he represented the defendant and wished to be present during any questioning) were not required to provide the defendant with the letter that defendant's counsel had written or to communicate, verbatim, the contents of that letter; and where, in the circumstances, it was reasonable for the detectives to require that the defendant review the entire Miranda waiver form before answering his questions about his counsel. [304-307]

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress statements made to a court officer while the defendant was being held in a holding cell (with a police detective standing nearby but out of sight), where the defendant was not subject to custodial interrogation when the court officer and the police detective went to the cell; and where, although the court officer's statement to the defendant was aimed at eliciting information likely to be incriminating, admission of the defendant's response to the court officer's question was harmless error, in that it

added little to the defendant's prior unprovoked statement and the jury heard considerable other evidence indicating the defendant's consciousness of guilt. [307-310]

At a criminal trial, the judge did not abuse her discretion in excluding evidence that a Commonwealth witness had brought a false accusation against a relative, where the evidence bore no material relationship to the witness's subsequent testimony; where no prosecution of the witness for the false accusation was pending; and where exclusion of the accusation did not deprive the defendant of evidence that might have had a significant impact on the outcome of his trial, in that he otherwise was permitted to cross-examine the witness and impeach her credibility extensively. [310-311]

At the trial of indictments charging, inter alia, felony-murder with armed robbery as the predicate offense, the evidence at the close of the Commonwealth's case was sufficient to satisfy a reasonable fact finder that the defendant had taken an item of value from the victim (i.e., currency in small denominations, a black bag, a street guide, and a small hackney license), and the Commonwealth supplemented its case with evidence from which the jury could infer that the defendant planned to rob the victim; further, the Commonwealth's case did not deteriorate after the defendant presented his evidence. [311-315]

A Superior Court judge did not err or abuse her discretion in denying the criminal defendant's motion for a new trial based on ineffective assistance of counsel, where trial counsel was not ineffective in failing to object to the proper introduction of evidence of the victim's business habit [315-317]; and where trial counsel was not ineffective for failing to investigate certain evidence, given that appellate counsel's subsequent efforts as to dispatch tickets issued to the victim (a taxicab driver) on the night of his death suggested little reason to think that the jury's decision would have been swayed by the information that might have been unearthed [317-320], and given that trial counsel's failure to notice a shadowy movement on a surveillance videotape could not have fallen below the level of an ordinary fallible lawyer [320].

INDICTMENTS found and returned in the Superior Court Department on December 21, 2005.

Pretrial motions to suppress evidence were heard by *Margaret R. Hinkle*, J., and *Elizabeth B. Donovan*, J.; the cases were tried before *Regina L. Quinlan*, J., and a motion for a new trial, filed on February 3, 2012, was heard by her.

*Philip G. Cormier* for the defendant.

*Cailin M. Campbell*, Assistant District Attorney (*Patrick Haggan*, Assistant District Attorney, with her) for the Commonwealth.

LENK, J. In December, 2008, a Superior Court jury convicted the defendant of murder in the first degree on the theory of

felony-murder, with armed robbery as the predicate felony. The defendant's convictions stem from the stabbing death of Heureur Previlon, a Brookline taxicab driver, whose body was found inside his vehicle in the early morning hours of August 25, 2005. The defendant and a codefendant, Jashawn Robinson, were indicted as joint venturers. Following the allowance of their motions to sever, they were tried separately and Robinson was acquitted.[1]

The matter is before us on the defendant's direct appeal, which was consolidated with his appeal from the denial of his motion for a new trial. The defendant claims that (1) it was error to have denied his pretrial motions to suppress statements made to police on three occasions as well as certain physical evidence gathered as a result of those statements; (2) the judge improperly precluded him from cross-examining Laura Pizarro, the defendant's former girl friend and a key Commonwealth witness, as to certain false statements she had made accusing a relative of sexual impropriety, which the defendant contends were relevant to show Pizarro's motive to lie; (3) the evidence was insufficient to support a conviction of felony-murder insofar as the Commonwealth could not establish the element of armed robbery that something of value had been taken; and (4) the judge erred in denying his motion for a new trial on the ground of ineffective assistance of counsel based on counsel's failure to investigate properly and to object to the admission of evidence crucial to establish the armed robbery. We affirm the defendant's conviction of murder in the first degree and the denial of his motion for a new trial. After a careful review of the record, we decline to exercise our authority under G. L. c. 278, § 33E, to order a new trial or to reduce the conviction to a lesser degree of guilt.

1. *Introduction.* Shortly after 1 A.M. on August 25, 2005, the victim, who worked for Bay State Taxi Company (Bay State), was driving the defendant and Robinson to a parking lot near the Fidelis Way housing development in the Brighton section of Boston, where the defendant often stayed at the home of his girl friend, Pizarro. At some point while the two were in his taxicab,

---

[1]Robinson also was indicted for murder in the first degree and armed robbery. He was acquitted in February, 2009.

the victim was stabbed. The vehicle ultimately rolled to a stop in the nearby parking lot of a hospital, where it was first noticed some hours later by hospital security staff.

Immediately after the stabbing, the defendant and Robinson went to Pizarro's apartment. Each had blood on his clothes. The defendant showed Pizarro a knife with aluminum foil on its handle, saying that he had "killed somebody." At the request of Robinson, Pizarro walked to the taxicab soon thereafter to retrieve items Robinson had left in it. When she arrived, she discovered the victim unresponsive and bleeding heavily. At approximately 5:45 A.M., the victim was found dead, lying in a fetal position on the front seat of the vehicle.

During the ensuing police investigation, bloody clothing was found in Pizarro's apartment that video surveillance footage linked to the defendant and Robinson. Deoxyribonucleic acid (DNA) testing identified the blood as the victim's. Early in the investigation, police spoke with Pizarro's aunt and the aunt's boy friend, who had telephoned police to report what they had seen at the apartment. Police also spoke with Pizarro and her cousin, William Brown. In addition to video surveillance footage from two sources, police obtained the defendant's cellular telephone records, which showed calls placed to Bay State after midnight on August 25, 2005.

In early September, 2005, warrants issued for the arrest of the defendant and Robinson on charges of murder and armed robbery. Shortly thereafter, they fled to Virginia using false names. Within weeks, they were arrested. After questioning by Boston detectives in a Virginia jail, the defendant was returned to Massachusetts. While in a holding cell in the Brighton District Court, awaiting arraignment, he made statements to Robinson about the night of the stabbing which were overheard by police.

On December 21, 2005, a Suffolk County grand jury indicted the defendant for murder in the first degree, G. L. c. 265, § 1, and armed robbery, G. L. c. 265, § 17. His several motions to suppress were denied. After a thirteen-day trial, the case went to the jury on all three theories of murder in the first degree. The jury found the defendant guilty of robbery and felony-murder predicated on armed robbery; the robbery conviction was placed on file. The defendant timely appealed.

2. *Trial.* We recite the facts the jury could have found, reserving some details for later discussion.

a. *The Commonwealth's case-in-chief.* i. *The events of August 24-25, 2005.* On the evening of August 24, 2005, the defendant and Robinson went to a convenience store in Cleveland Circle in Brighton; their images were captured by the store's video surveillance camera at approximately 12:33 A.M. A few minutes earlier, at approximately 12:20 A.M., the defendant had telephoned Pizarro's cousin, Brown, and told him to stay by his telephone.[2]

At approximately 12:35 A.M., the defendant telephoned Bay State and requested a taxicab. He called again at 12:42 A.M., then at 12:44 A.M., and once more at 12:58 A.M., that time to complain that no taxicab drivers would pick him up in front of Cleveland Circle.[3] Two drivers were dispatched, but each refused to pick up the defendant and Robinson. At 1:12 A.M., Robinson called Bay State using the name "Jonathan" and requested that a taxicab pick him up at the Reservoir subway station in Brighton.[4] Previlon was dispatched to that location, and was not heard from again.

During the taxicab ride to the hospital parking lot adjoining the Fidelis Way housing development, the defendant sat in the rear seat behind the front passenger seat and Robinson sat in the rear seat behind the driver.[5] Robinson grabbed Previlon from behind, pulled him into the rear of the vehicle, and held him as the defendant stabbed him in the right side of the chest. The defendant then jumped out of the rear passenger window, which had been smashed by Previlon's flailing feet.

The defendant and Robinson walked together to Pizarro's

---

[2]Pizarro lived in her aunt's apartment on Jette Court, a part of the Fidelis Way housing development, with her aunt; her cousin, William Brown; and another cousin. The apartment is located near the hospital parking lot, which is visible from Pizarro's bedroom window.

[3]Evidence at trial indicated that it would take approximately fifteen minutes to walk to Jette Court from Cleveland Circle, and that the evening of August 25, 2005, was temperate.

[4]Unlike Boston taxicabs, Brookline taxicabs do not have partitions separating the driver from rear seat passengers.

[5]The defendant's fingerprints were found on the outer frame of the rear passenger door.

apartment on Jette ·Court. At approximately 1:30 A.M., the defendant, sounding "really hyper excited," telephoned Brown and asked to be admitted to the apartment building, a call overheard by Pizarro's aunt. Pizarro noticed that the defendant had blood on his shirt, and that Robinson had blood on his pants and a cut on his arm.[6]

Robinson asked Pizarro to retrieve his sneaker, hat, and cellular telephone clip from the taxicab. Pizarro walked to the parking lot and saw the vehicle, which had come to rest against a light pole, with its lights and radio on. Through the broken rear passenger side window, she called out to the victim, who was in the front seat. When he did nòt respond, Pizarro opened the rear passenger door, retrieved Robinson's items, and returned to the apartment;[7] blood from the hat stained her sneakers and the front walk. Pizarro put the sneakers Robinson and the defendant had been wearing in a bucket with water and bleach, then placed their clothes in a backpack.[8] She mopped to remove blood from the floor of her bedroom and near the front door of the apartment. The defendant and Robinson spent some time in Pizarro's room and left after they changed their clothes.

ii. *The police investigation and the defendant's flight to Virginia.* At approximately 6:30 A.M. on August 25, 2005, hospital personnel found the victim's taxicab resting against the light pole with its right rear passenger window smashed. The victim was in the fetal position in the front seat, dead of a knife wound to the right chest. Police found a knife with aluminum foil covering the handle in a wooded area behind the hospital's parking lot, in the direction of Jette Court,[9] and observed shattered glass and blood stains leading in that direction.

---

[6]The following morning, Pizarro's aunt and her boy friend noticed blood spots on the walkway leading to the apartment building. Pizarro told them that Robinson had been hurt. Later that day, Pizarro's aunt and her boy friend informed Boston police of what they had seen and heard.

[7]The hospital surveillance video recording showed Pizarro walk to the taxicab and return toward Jette Court.

[8]Subsequent deoxyribonucleic acid (DNA) testing identified the blood on the clothing as belonging to the victim. Video surveillance from the Cleveland Circle convenience store showed the defendant and Robinson enter and leave the store shortly before Previlon picked them up; the two men were wearing the clothing later discovered in Pizarro's apartment.

[9]Police found a second knife in Pizarro's apartment.

After investigators learned from Pizarro's aunt and her boy friend about the cut on Robinson's arm and the bloodstains leading up to the apartment, three officers went to Jette Court to look for Pizarro and Brown in order to speak with them about the events of the previous evening. During their search, officers encountered a man who identified himself as the defendant. Ultimately, the officers arrested the defendant on an unrelated trespassing offense and seized his cellular telephone. The defendant was booked for the trespass offense and released on bail.

Approximately one week later, after the arrest warrants for the defendant and Robinson issued, Robinson, the defendant, and Robinson's girl friend, Stephanie Rodriguez-Ruiz, took a bus to Virginia. Only Rodriguez-Ruiz brought luggage, and the men used false names. Robinson and the defendant were arrested for murder and armed robbery on September 28, 2005, in Suffolk, Virginia. The defendant gave police a false name upon arrest and, when later interviewed, denied knowing anyone named "Jashawn" or "Hova,"[10] denied that he had a girl friend named Laura Pizarro, and stated that he had come to Virginia alone.

iii. *The taxicab drivers' testimony.* To prove that an armed robbery or an attempted armed robbery had taken place, the Commonwealth introduced extensive testimony from the victim's fellow taxicab drivers to the effect that the victim usually had certain items with him at work, and that some of these items were not found after the stabbing. The victim's uncle testified that the victim generally carried a black bag while on duty, which would contain compact discs, a book, cash in denominations smaller than twenty dollar bills to make change, a small taxicab (hackney) license, a street guide, and a map. Detective Brian Black, the lead detective assigned to investigate the stabbing, testified that the officers who searched the taxicab and the parking lot, the area surrounding Pizarro's apartment building, the victim's personal automobile and residence, and the victim's father's house, located five twenty dollar bills in the victim's pants pocket, but were unable to locate a black bag, cash in small denominations, a street guide, or the victim's small hackney

---

[10]Hova is Jashawn Robinson's nickname.

license.[11] The jury also heard testimony from eight Bay State taxicab drivers, one dispatcher, and a Brookline hackney officer, to the effect that the victim customarily had these items with him when he worked.

Seven drivers testified that on prior occasions they had seen the victim with a black bag while at work. One driver had seen the victim with a bag on occasion in July and August, 2005. Another said the victim "always" had a black bag with him and that he had seen the victim with such a bag two days prior to his death. The victim's shift partner had at times seen the victim with a bag during shift changes. Another driver testified that he had seen the victim with a black bag near his feet the night he was killed, and that he sometimes sat with the victim in his taxicab and saw such a bag. The Brookline hackney officer testified that, each time he had inspected the victim's taxicab, he had seen a bag inside it.

At least seven taxicab drivers testified that drivers generally carry bills in small denominations while working, and four testified that it was their personal practice, as well as the personal practice of drivers generally, to separate large denomination bills from small denomination bills. The Brookline hackney officer testified that taxicab drivers could be fined one hundred dollars for failing to carry twenty dollars in small denomination bills with which to make change, and that he had never cited the victim for noncompliance.[12]

Six taxicab drivers testified that they carried a street guide while working, and four testified that drivers must carry two licenses, including a smaller license on their person. The Brookline hackney officer also testified that drivers are required to have two licenses while on duty, one large and affixed to the taxicab and the other small. He had never cited the victim for noncompliance.

iv. *The defendant's statements.* The Commonwealth presented

---

[11]There was no testimony at trial specifically indicating whether a book, a map, or compact discs were ever recovered.

[12]The jury also heard testimony and saw physical evidence that the victim picked up a passenger at approximately 11:15 P.M., less than two hours before the victim picked up the defendant and Robinson. This passenger testified that she had likely paid her seven dollar fare either with a ten dollar bill, receiving change, or with one five dollar bill and two one dollar bills.

evidence that the defendant made a number of statements to Pizarro, Brown, and Rodriguez-Ruiz as to his participation in the armed robbery and stabbing of Previlon. When he and Robinson arrived at Jette Court after the stabbing, the defendant told Pizarro[13] he had "killed somebody" and produced a knife with aluminum foil on its handle; he said that the knife had "slipped right in." The aluminum foil, the defendant told Pizarro, "stopped the fingerprints from showing up." The defendant then asked Brown if he would "rat out" a friend who had killed someone, then said that "snitches would be killed." Several days after the stabbing, the defendant told Rodriguez-Ruiz that he had "killed the cabdriver," and that "the cabdriver called him a bitch," so he "had to do what he had to do."

In addition to these statements, the jury heard testimony from two inmates[14] who overheard the defendant discussing the stabbing while in jail in Virginia. Vernon Petway testified that the defendant was "bragging" that he had stabbed a taxicab driver during a "robbery that went bad." The defendant told him that he had used a knife to stab the driver, and that he had escaped through the window of the taxicab. Petway also testified that the defendant said he had swallowed the "chip" to his cellular telephone.

Robert Taylor heard the defendant say that he and a man called "Hova"[15] were "caught up in a murder case in Boston." Taylor testified that the defendant said he was sitting on the passenger side of the taxicab's rear seat as Hova grabbed the

[13]Pizarro testified pursuant to a cooperation agreement with the Commonwealth, after she was indicted on two counts of being an accessory after the fact to murder. The jury were instructed about this agreement and Pizarro was cross-examined extensively as to her credibility. See discussion, *infra.*

[14]Robert Taylor, who had previously testified in two unrelated cases pursuant to Federal cooperation agreements, testified for the Commonwealth in an effort to reduce his sentence further. No benefit had accrued to him at the time of trial, but he believed his sentence would be reduced pending a guilty verdict. Vernon Petway testified pursuant to the terms of his Federal plea agreement. Like Taylor, Petway hoped his testimony would result in a reduction of his sentence, but no such reduction had occurred at the time of trial. Both of these cooperation agreements were disclosed to the jury with appropriate instructions, and Taylor and Petway were extensively cross-examined as to credibility.

[15]Detective Brian Black, the lead investigator, testified that Robinson's nickname, "Hova," had not been released to the public.

taxicab driver, and described how the defendant stabbed the driver before jumping out of the vehicle and throwing away the murder weapon. Like Petway, Taylor also testified that the defendant had described swallowing his "SIM" card[16] because the telephone had been used to call for a taxicab.[17]

b. *The defendant's theory of the case.* The defendant, who testified on his own behalf, maintained that Robinson stabbed the victim after the two exchanged heated words in which he had no part, and that no robbery either was planned or took place. He otherwise confirmed the central facts alleged by the Commonwealth, testifying that he went to Cleveland Circle with Robinson on the night of the stabbing to meet friends, with each carrying a knife with a handle wrapped in aluminum foil. He said that the knives, taken from Robinson's kitchen and wrapped in foil to prevent fingerprints, were for protection against the residents of another housing project who had "jumped" him "a few" times. According to the defendant, when the taxicab arrived at the parking lot, Robinson and Previlon began to fight, and Robinson dragged Previlon into the back seat of the vehicle. As the defendant tried to unlock the rear door to get out, Previlon kicked the lock so that it bent and the door became inoperable, and, subsequently, kicked through the rear passenger window.

The defendant did not remember Petway or Taylor and denied having spoken about a robbery or a murder while incarcerated in Virginia.[18] He denied having told Pizarro and Brown that the knife "slipped right in" or having told Rodriguez-Ruiz he "did what he had to do."

3. *Discussion.* a. *Motions to suppress evidence.* Prior to trial, the defendant moved to suppress statements he made to police on three separate occasions: during the encounter outside the

---

[16]The "SIM" card is what allows the telephone to connect to the telephone service provider's communications network, and thereby allows the telephone to send and receive calls. See generally *In re Apple iPhone Antitrust Litig.*, 874 F. Supp. 2d 889, 892 n.5 (N.D. Cal. 2012).

[17]According to Black, that the defendant's cellular telephone was missing its SIM card was not released to the public. Black was unaware of the missing card until he spoke with Taylor regarding his testimony.

[18]The defendant did recall telling someone that he had swallowed the "SIM" card from the telephone.

apartment on Jette Court shortly after the stabbing, during his interrogation at a jail in Virginia several weeks later, and during his detention in a Brighton District Court holding cell while awaiting arraignment. The defendant alleges that each statement was obtained unlawfully and, because the statements went to credibility and consciousness of guilt, that their admission at trial cannot be deemed harmless. The admission of his cellular telephone, seized during the Jette Court encounter, served to corroborate certain testimony elicited by the Commonwealth, and, he claims, was similarly prejudicial. We review de novo the judge's application of constitutional principles in considering the denial of the defendant's motions to suppress. *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

i. *Jette Court seizure.* On August 26, 2005, the day after the stabbing, Black, together with Detectives Michael Devane and Colm Lydon of the Boston police department's homicide unit, went to Pizarro's apartment on Jette Court after receiving information regarding the stabbing from Pizarro's aunt and her boy friend. While they drove past a nearby address on Jette Court, the detectives saw a group of people. One man was wearing a long-sleeved sweatshirt with the hood up; the temperature was approximately eighty degrees and all of the others wore short sleeves. As the detectives backed their cruiser toward the group, the man in the sweatshirt began to walk away as others said, "Run, run, they're coming after you."

Devane got out of the cruiser and addressed the man, saying something to the effect of, "Hold on a second, I want to talk to you."[19] The man, who was the defendant, stopped in front of a nearby building on Jette Court, placed his cellular telephone on the window sill, and gave Devane his name. The defendant acknowledged that he had been arrested for trespassing in the area, and that a trespass notice for the area had been issued

---

[19]Devane testified at the hearing on the motion to suppress that he did not remember precisely what words he used, but that he said something like, "Hold on a second. You got a second? I want to talk to you." He conceded on cross-examination that he had intended to stop the defendant and may have used the word "stop" when exiting the police cruiser. Devane wrote in his police report that he "asked [the defendant] to stop and told him I wanted to speak with him." The defendant testified that the detective "told [him] to stop."

against him. Devane noticed stains on the defendant's pants, which the defendant identified as bleach. When asked about his telephone, the defendant gave Devane the number and said it belonged to a friend, but told Devane the telephone did not work because it was out of batteries or because the minutes were used up, and that he no longer wanted it. In the course of his arrest for violation of the no trespass order, the defendant asked Devane if trespassing was all that he was being arrested for. Black subsequently searched the defendant's telephone, without a warrant, and found that its "SIM" card was missing.[20]

The defendant argues that Devane's conduct amounted to an improper stop absent reasonable suspicion and that, as such, the judge erred in denying the defendant's motion to suppress his statements to police. A number of the statements in question — that the defendant's girl friend lived at an address on Jette Court, that his pants were stained with bleach,[21] that his telephone did not work for reasons other than a missing SIM card, and his inquiry about the reason for his arrest — were inculpatory and thus not harmless beyond a reasonable doubt. The defendant also contends that Black's search of the cellular telephone was invalid because it was conducted without a warrant, and that the subsequent admission of the telephone was prejudicial since the absence of the SIM card made the jury more likely to credit the testimony of Petway and Taylor.

Pursuant to the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, a "seizure" occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States* v. *Mendenhall*, 446 U.S. 544, 554 (1980). See *Commonwealth* v. *Stoute*, 422 Mass. 782, 785-789 (1996) (adopting *Mendenhall* standard for purposes

---

[20]Black offered somewhat different accounts of when he searched the defendant's telephone. At the suppression hearing on November 13, 2007, Black stated that he searched the telephone — including looking for the "SIM" card — several days after its seizure. At the December, 2008, trial, however, he testified that he did not search the telephone until after he spoke with informant Robert Taylor "on or about" November, 2007, since he had not learned of the missing SIM card until his conversation with Taylor.

[21]Pizarro testified that, in the early morning hours of August 25, 2005, she used bleach to mop her floors and to fill the bucket into which she put sneakers belonging to the defendant and Robinson. See discussion, *supra.*

of art. 14). If a suspect was seized in the constitutional sense, we ask whether the stop was based on an officer's reasonable suspicion that the person was committing, had committed, or was about to commit a crime. *Commonwealth* v. *Wilson*, 441 Mass. 390, 394 (2004), citing *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974).

Although the record does not establish the precise words Devane used in addressing the defendant, the motion judge found that Devane had "called out to [the defendant] to hold up or stop we want to speak with you or words to that effect." These words more closely resemble a "request to speak with the defendant and ask questions," *Commonwealth* v. *Nestor N.*, 67 Mass. App. Ct. 225, 228-229 (2006), which does not rise to the level of a seizure, than a "command to stop," *id.*, which is an "intrusion of constitutional dimensions that requires justification." *Commonwealth* v. *Gomes*, 453 Mass. 506, 510 (2009). See, e.g., *Commonwealth* v. *Lopez*, 451 Mass. 608, 610 (2008) (statement "can I speak with you" not seizure); *Commonwealth* v. *Barros*, 435 Mass. 171, 172, 173-174 (2001) (statement "Hey you . . . I want to speak with you" was not seizure); *Commonwealth* v. *Stoute*, *supra* at 789 (police request that suspect "hold up a minute" not seizure).[22] Particularly given that the defendant continued to walk away quickly after Devane called out to him, the motion judge did not err in concluding that a reasonable person in the defendant's situation would have felt free to leave. See *Commonwealth* v. *Sykes*, 449 Mass. 308, 313 (defendant felt free to leave where he did not respond to officer; no stop); *Commonwealth* v. *Rock*, 429 Mass. 609, 611-612 (1999) (officer's request to "talk to you for a second" left suspect believing he was free to leave).

The subsequent search of the defendant's cellular telephone was constitutionally permissible because the defendant had abandoned the telephone, and, as such, had no expectation of privacy in it. See *Commonwealth* v. *Carter*, 424 Mass. 409, 412

---

[22]Moreover, the defendant was not seized when the detectives got out of their cruiser and began to walk towards him. Since the defendant began to walk towards the building on Jette Court before the officers began following him, the detectives were not in pursuit such that the defendant was "stopped" by their conduct. See *Commonwealth* v. *Battle*, 365 Mass. 472, 474-475 (1974) (police pursuit of already-moving suspect not seizure).

(1997). Black and Devane testified at the motion hearing that the defendant placed the telephone on a window sill upon reaching the building. The defendant told the detectives that the telephone was not his and that he did not want it anymore, and he never retrieved the telephone from the window sill. This evidence, indicating as it does that the defendant voluntarily gave up control over the telephone, see *Commonwealth* v. *Battle*, 365 Mass. 472, 475-476 (1974), is sufficient to support the motion judge's conclusion that the defendant abandoned the telephone. See, e.g., *Commonwealth* v. *Carnes*, 81 Mass. App. Ct. 713, 716-717 (2012) (defendant's handling of backpack evinced no legitimate expectation of privacy where he left backpack in friend's backyard); *Commonwealth* v. *Nutile*, 31 Mass. App. Ct. 614, 619 (1991), quoting *Commonwealth* v. *Battle*, *supra* (no expectation of privacy in objects thrown from automobile).

ii. *Statements during Virginia interrogation.* After the defendant had been arrested in Virginia, his counsel, who was working in Boston, sent a letter to the Suffolk County district attorney's office stating that he represented the defendant, that the defendant should not be interviewed without counsel present, and that counsel wanted to speak with the defendant prior to any questioning.[23] Black and Detective William Doogan of the Boston police department took a copy of the letter with them when they went to the jail in Virginia to question the defendant. They also brought a Miranda waiver form onto which they typed the following at the top of the page:

> "I have been advised by Detectives Black and Doogan that a lawyer has contacted the Boston Police and stated

---

[23]Trial counsel's letter, written on his letterhead and including counsel's name and address, as well as other contact information, stated:

> "I represent Cleveland Martin in connection with . . . the alleged homicide of Heureur Previlon . . . Please inform all law enforcement personnel engaged in the investigation and prosecution of this matter, including those in Virginia, that I now represent Mr. Martin and wish to be present at any and all times when law enforcement personnel or their agents question Mr. Martin. Moreover, at least until I have had sufficient opportunity to speak to Mr. Martin, I ask that no law enforcement personnel attempt to question Mr. Martin in connection with the alleged homicide of Mr. Previlon or in connection with any other matter."

that he represents Cleveland Martin and that he wishes to be present during any questioning."

Before they questioned the defendant, Doogan and Black reviewed the form with him; at that point, the defendant said, "I got a lawyer? Good." The defendant then initialed the form, including the added typewritten portion. At no point did the detectives show the defendant his attorney's letter. The detectives asked the defendant whether he knew that he had an attorney; the defendant replied that he did not, and that he was not permitted to make long-distance calls from the jail. Black told the defendant to "[h]old on; we'll get to that, but first we have to get through this form." The defendant did not inquire further about his attorney, waived his Miranda rights, and agreed to speak with police. After a period of questioning, the defendant asked the detectives if they thought he had committed murder. When they responded in the affirmative, the defendant said he would not answer further questions without an attorney present and the interview ended.

The defendant alleges that his waiver of his Miranda rights was invalid because the officers conducting the interview did not adhere to the bright-line duty to inform him of trial counsel's legal advice. See *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 849 (2000) (*Mavredakis*). Since we presume prejudice from a *Mavredakis* violation unless the error is proven harmless beyond a reasonable doubt, *Commonwealth* v. *McNulty*, 458 Mass. 305, 318-319 (2010) (*McNulty*), the defendant maintains that his statements must be suppressed.[24] The defendant claims also that the detectives impermissibly conditioned further conversation regarding counsel on a waiver of his Miranda rights.

We held in *Mavredakis*, *supra* at 861, quoting *State* v. *Stoddard*, 206 Conn. 157, 169 (1988), that police must "apprise the

---

[24]The defendant refers, specifically, to the statement that he planned to return to Massachusetts after learning of the warrant against him, the statement that he had gone to Virginia alone, the statement that he did not know anyone named "Hova" or "Jashawn," his efforts to avoid association with Pizarro, and his refusal to answer when asked whether he had used his cellular telephone to call a taxicab on the night in question. All of these statements, he argues, went to consciousness of guilt and damaged his credibility with the jury.

defendant of a specific communication from his attorney that b[ears] directly on the right to counsel." This "duty to inform a suspect of an attorney's efforts to render assistance is necessary to actualize the abstract rights listed in *Miranda* v. *Arizona*, 384 U.S. 456 (1966)." *Mavredakis, supra* at 860. Once an attorney has identified himself as counsel acting on a suspect's behalf, police must cease questioning and inform the suspect of the communication. If police fail to do so, any later waiver of the suspect's Miranda rights becomes "inoperative." *Id.* at 861, quoting *Commonwealth* v. *McKenna*, 355 Mass. 313, 324 (1969).

We subsequently have clarified the scope of *Mavredakis*. While holding in *McNulty* that police officers had a duty to convey an attorney's legal advice that a defendant avoid speaking to police, in *Commonwealth* v. *Rivera*, 464 Mass. 56, 67, cert. denied, 133 S. Ct. 2828 (2013) (*Rivera*), we distinguished between those situations in which an attorney instructs police to tell a defendant not to talk to them, and those situations in which an attorney instructs police not to talk to a defendant. The former, we said, constitutes "legal advice aimed at the defendant," whereas the latter constitutes "an attempt by the attorney to invoke his client's right to silence." *Id.* We declined "to extend *McNulty* to a situation where the attorney merely instructs the police not to talk to his client." *Rivera, supra* at 67. See *Commonwealth* v. *Beland*, 436 Mass. 273, 288 (2002) (attorney has no affirmative duty to request that police cease questioning of client).

The defendant has no recourse under *Mavredakis* and its progeny. The interrogating officers were not required during the interview to provide the defendant with the letter his counsel had sent to the district attorney's office, or otherwise to communicate, verbatim, the contents of that letter. Not only is there "no requirement that police deliver verbatim to a defendant the message given by his attorney," *Commonwealth* v. *Vao Sok*, 435 Mass. 743, 752 (2002), the letter itself, addressed entirely to law enforcement personnel, did not constitute advice to the defendant that would have triggered the protections of *Mavredakis*. Counsel did not offer legal advice directly to the defendant or ask police to communicate any such advice to him, instead

requesting only "that no law enforcement personnel attempt to question Mr. Martin." Insofar as counsel's letter merely instructs police not to talk to his client, it falls squarely within our holding in *Rivera, supra.* Accordingly, there was no violation of *Mavredakis,* and the defendant's waiver of his Miranda rights, after reading and signing the typed statement at the top of the form, was valid.

The defendant's related contention — that police impermissibly required him to complete the Miranda waiver form before answering his questions about the existence of his purported counsel — is also unavailing. Although a defendant's waiver of his Miranda rights is valid only if he has been apprised of an attorney's efforts to contact him, see *Mavredakis, supra,* Doogan and Black fulfilled their obligation to inform the defendant of counsel's efforts. At the same time, the detectives were also obliged to give the defendant Miranda warnings prior to his custodial interrogation. *Commonwealth* v. *Simon,* 456 Mass. 280, 285-286, cert. denied, 131 S. Ct. 181 (2010). The motion judge determined that it was reasonable in the circumstances[25] for the detectives to require that the defendant review the entire Miranda waiver form before answering his questions about counsel to "guard against improper pre-Miranda statements." We discern no error in this ruling.

iii. *Statements in Brighton District Court holding cell.* On October 11, 2005, the defendant was transported to the Brighton District Court for arraignment and placed in a holding cell. While there, the defendant made statements about the victim to Robinson, who was being held several cells away; court officer Jay Crowley told the defendant he should follow his attorney's advice to remain silent. The defendant, however, continued to talk.

Crowley told Doogan that the defendant was speaking loudly in the lockup area despite Crowley's warning. Crowley and Doogan went to the lockup area; Crowley motioned for Doogan to remain out of sight. As Crowley approached the cell area, the

---

[25]The defendant did not ask additional questions about his attorney after reviewing the Miranda waiver form, and Doogan testified that he "never had an opportunity to go back over [defense counsel's letter]" because the defendant "ended the interview so abruptly."

defendant began to call out to him. Crowley again warned the defendant to remain silent. The defendant instead said to Crowley that he, the defendant, had not stabbed the taxicab driver, but rather, "the bitch did it." Crowley responded, "You mean to tell me that there was two dudes in the car and the girl did the stabbing?" The defendant replied, "Yeah, why not? What, just because she's a girl? Are you saying a girl can't stab someone?"

The defendant contends that these statements should have been suppressed as the product of custodial interrogation conducted without Miranda warnings. He argues that he was subject to custodial interrogation when Crowley brought Doogan to the lockup, instructed Doogan to stay out of sight, and then approached the defendant, and also that Crowley's subsequent statement to the defendant constituted separate custodial interrogation. Because his statements that "the bitch did it" and his subsequent response to Crowley's question pertained to consciousness of guilt, the defendant argues, their admission in evidence was prejudicial error.

Statements obtained as a result of custodial interrogation absent appropriate Miranda warnings ordinarily are inadmissible at trial. See *Commonwealth* v. *Martin*, 444 Mass. 213, 218 (2005) (*Miranda* protects rights guaranteed under both Fifth Amendment and art. 12). Custodial interrogation occurs when a defendant is subject to "express questioning or its functional equivalent." *Rhode Island* v. *Innis*, 446 U.S. 291, 300-301 (1980). Functional equivalence is based on an "objective assessment as to whether the police statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances." *Commonwealth* v. *Torres*, 424 Mass. 792, 797 (1997), quoting *United States* v. *Taylor*, 985 F.2d 3, 7 (1st Cir.), cert. denied, 508 U.S. 944 (1993).[26]

The defendant was not subject to custodial interrogation when court officer Crowley and police detective Doogan went to the cell. To be sure, conduct, rather than words, may in some

---

[26] A court officer who conducts a custodial interrogation is, functionally, a law enforcement agent such that the requirements of the *Miranda* decision apply. *Commonwealth* v. *Hilton*, 443 Mass. 597, 616-617 (2005), *S.C.*, 450 Mass. 173 (2007).

circumstances constitute custodial interrogation. See *Commonwealth* v. *Harkess*, 35 Mass. App. Ct. 626, 632 (1993). Nonetheless, there was nothing here in the nature of an accusatory inquiry or a demand for explanation. *Id.* Spontaneous or unprovoked statements are not the product of custodial interrogation. See *Commonwealth* v. *Koumaris*, 440 Mass. 405, 409 (2003). Crowley's conduct was not transformed into custodial interrogation simply because the defendant had previously made spontaneous statements in his presence. See *Commonwealth* v. *Torres*, *supra* at 798, quoting *United States* v. *Taylor*, *supra* at 8 (mere fact that officer was aware of "possibility" suspect would make incriminating statement insufficient to establish custodial interrogation).

The situation is otherwise as to Crowley's subsequent statement, "You mean to tell me that there was two dudes in the car and the girl did the stabbing?" which crossed the line into custodial interrogation. We have distinguished between statements that merely rephrase a defendant's remarks or constitute rhetorical questions, see *Commonwealth* v. *Foley*, 445 Mass. 1001, 1002-1003 (2005), cert. denied, 548 U.S. 927 (2006), and those that are aimed at eliciting information likely to be incriminating. See *Commonwealth* v. *Larkin*, 429 Mass. 426, 432 (1999). Here, an officer in Crowley's position was likely to know that his statement would provoke an incriminating response, *Rhode Island* v. *Innis*, *supra* at 301, and that a reasonable person in the defendant's position would perceive Crowley's statement as inviting a response. Compare *Commonwealth* v. *Mitchell*, 47 Mass. App. Ct. 178, 180-181 (1999) (statement commenting on poor timing of defendant's arrest merely "observation"), with *Commonwealth* v. *Chadwick*, 40 Mass. App. Ct. 425, 428 (1996) (officer's statement disputing defendant's denial of rape charges was functional equivalent of custodial interrogation).

In the circumstances, however, admission in evidence of the defendant's response to Crowley's question was harmless error. See *Commonwealth* v. *Tyree*, 455 Mass. 676, 700 (2010). To begin, it added little to the defendant's prior unprovoked statement, "that bitch did it." In addition, the jury heard considerable other evidence indicating the defendant's consciousness of guilt, including his statements to several different people that he

had killed someone, that he had stabbed a taxicab driver, and that he had done so during a robbery gone bad. They also heard of his flight to Virginia, his efforts to avoid law enforcement, and the use of a false name while traveling and when apprehended. Given this, the improperly admitted evidence would have had but little effect upon the jury. *Commonwealth* v. *Ghee*, 414 Mass. 313, 319 (1993) (*Miranda* error harmless where circumstantial evidence independent of wrongly admitted statements overwhelmingly established guilt).

b. *Limitation on cross-examination.* The defendant sought leave to cross-examine Pizarro regarding a false accusation she had made that her live-in grandfather had raped her aunt.[27] He argued that such cross-examination was necessary to impeach Pizarro and demonstrate her motive to lie. Specifically, he sought to discredit her testimony that the defendant said he had stabbed the victim and that the knife "slipped right in," and to show that Pizarro was motivated to testify favorably for the Commonwealth in order to avoid potential prosecution for her part in bringing false rape charges against her grandfather. The judge's exclusion of this line of cross-examination, the defendant contends, violated his rights to confrontation and to present a defense.

The specific acts of misconduct of a witness, not material to the case in which she testifies, are ordinarily inadmissible on cross-examination to impeach her credibility. *Commonwealth* v. *LaVelle*, 414 Mass. 146, 151 (1993), quoting P.J. Liacos, Massachusetts Evidence 149 (5th ed. 1981); Mass. G. Evid. § 608 (b) (2013). We have "chiseled" a narrow exception to this rule where the denial of cross-examination would run counter to the interests of justice, see *LaVelle*, *supra*, at 151, or would deprive the defendant of evidence that might have a significant impact on the outcome of the trial, *Commonwealth* v. *Bohannon*, 376 Mass. 90, 92-93, 94 (1978), *S.C.*, 385 Mass. 733 (1982)

---

[27]In support of his motion in limine to cross-examine Pizarro as to the false accusation, the defendant offered a police investigative report from March 7, 2008, indicating that Pizarro and her aunt's boy friend had together contrived a false accusation in 2006 in order to oust the grandfather from the apartment on Jette Court that Pizarro shared with her aunt and two of her cousins. The report stated that Pizarro's aunt had recanted the accusation in early 2008, revealing its falsity, and implicated Pizarro in its creation.

(prior false allegations of rape admissible to impeach victim again alleging rape). Whether to admit evidence of a witness's prior misconduct is within the discretion of the trial judge. *Commonwealth* v. *McGeoghean*, 412 Mass. 839, 841 (1992).

We discern no abuse of discretion in the exclusion of the proffered evidence. First, Pizarro's prior false accusations against her grandfather bore no material relationship to her subsequent testimony against the defendant, and the defendant offers nothing to suggest otherwise. Moreover, the defendant did not demonstrate that any prosecution of Pizarro for the false accusation was pending; nor does the record indicate that Pizarro made statements to police regarding the rape charges or that the statement of Pizarro's aunt would result in criminal prosecution of Pizarro by the Commonwealth.

Finally, the exclusion of Pizarro's prior false accusations did not deprive the defendant of evidence that might have had a significant impact on the outcome of the trial. The defendant was permitted to, and did, impeach Pizarro extensively, probing her cooperation agreement with the Commonwealth and the various inconsistencies in her statements to law enforcement personnel, thereby putting before the jury questions concerning her motive to lie and her credibility as a witness. Evidence of unrelated prior false accusations would not appreciably have enhanced the defendant's efforts to show her a liar. See *Commonwealth* v. *Avalos*, 454 Mass. 1, 8 (2009), citing *Commonwealth* v. *LaVelle*, *supra* at 154 (no abuse of discretion where cross-examination prohibited but issue still "sufficiently aired").

c. *Sufficiency of evidence as to armed robbery.* The defendant argues that the judge erred in denying his motion for required findings of not guilty where the evidence was insufficient as a matter of law to establish the occurrence of an armed robbery, the predicate offense for the defendant's conviction of murder in the first degree on a theory of felony-murder. He contends in this regard that the Commonwealth failed to show that anything of value was taken from the victim.[28] After our review of the entire record, we conclude that the Commonwealth's evidence

[28]To establish felony-murder predicated on armed robbery, the Commonwealth was required to prove that the defendant, as a principal or as a

was sufficient to establish, beyond a reasonable doubt, that the defendant took an item or items of value from the victim. *Commonwealth* v. *Anderson*, 461 Mass. 616, 633, cert. denied, 133 S. Ct. 433 (2012).

The Commonwealth bears the burden of introducing sufficient evidence to "satisfy[] a rational trier of fact of each element [of the charged offense] beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 678 (1979), citing *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). Although a conclusion "may not rest upon the piling of inference upon inference or conjecture upon speculation," *Commonwealth* v. *Armand*, 411 Mass. 167, 170 (1991), a conviction may rest upon circumstantial evidence alone, and the inferences a jury may draw from the relevant evidence "need only be reasonable and possible, and need not be necessary or inescapable." *Commonwealth* v. *Quinones*, 78 Mass. App. Ct. 215, 219 (2010). The existence of conflicting evidence does not mandate a required finding of not guilty, *Commonwealth* v. *Marinho*, 464 Mass. 115, 118 (2013), quoting *Commonwealth* v. *Merry*, 453 Mass. 653, 662 (2009), and we do not weigh supporting evidence against conflicting evidence when considering whether the jury could have found each element of the crime charged, *Commonwealth* v. *Merry*, *supra* at 660, citing *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005).

Because the defendant moved for a required finding of not guilty at the close of the Commonwealth's case, "[w]e consider the state of the evidence [at that point] to determine whether the defendant's motion should have been granted at that time," *Commonwealth* v. *McDonald*, 462 Mass. 236, 241 (2012), quoting *Commonwealth* v. *Semedo*, 456 Mass. 1, 8 (2010), and construe that evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore*, *supra*, at 676-677; *Commonwealth* v. *Cordle*, 412 Mass. 172, 173 (1992). Once the defendant's evidence has been submitted, we ask whether the

joint venturer, was armed with a dangerous weapon, that he had applied force to the victim or put the victim in fear, and that he had taken something of value from the person of the victim. Only the sufficiency of the evidence as to the final element is contested on appeal. The jury were also instructed that attempted armed robbery would suffice as a predicate offense for felony-murder, but returned a guilty verdict as to the completed offense.

Commonwealth's case deteriorated because necessary evidence was "later shown to be incredible or conclusively incorrect." *Commonwealth* v. *O'Laughlin*, 446 Mass. 188, 203 (2006), quoting *Kater* v. *Commonwealth*, 421 Mass. 17, 20 (1995).

After searching the interior of the victim's taxicab, the entire area surrounding the parking lot, the victim's personal automobile and residence, and the residence of the victim's father, police found neither bills in small denominations, a black bag, a street guide, nor a small hackney license. The jury reasonably could have inferred from testimony offered at trial that the victim had each of these items in his taxicab on the night of August 25, 2005. From this, the jury would have been warranted in concluding that one or more of these items was taken from the victim during a robbery. See *Commonwealth* v. *Mandile*, 403 Mass. 93, 97 (1988) (where evidence suggests victim possessed item and item was not discovered during subsequent search, jury could infer item was taken in robbery).

As to the cash, the jury could have inferred that the victim had currency in small denominations on his person on the night of the stabbing. Brookline taxicab drivers were required to carry twenty dollars in small bills on their persons in order to make change for fares less than twenty dollars, and the jury heard testimony that the victim had received no citations for violating this rule in his seven years as a taxicab driver. Several taxicab drivers testified that it was their personal practice, as well as the practice of other drivers, to carry small bills with which to make change. The Commonwealth presented evidence that the final passenger dispatched to the victim on the night of the stabbing, whose statements were introduced at trial, paid with small bills. From this, the jury reasonably could have inferred that the victim had bills in small denominations with him when the defendant entered the taxicab, a vehicle used for business purposes. See *Commonwealth* v. *Mandile*, *supra* at 97-98 (reasonable to infer routine presence of large amounts of paper money in commercial establishment as opposed to private residence).

Similarly, the jury could have inferred that the victim had a black bag, a street guide, and a small hackney license with him on the night he was killed. The jury were free to credit the testimony of the driver who stated that he had seen a black bag

on the ground near the victim outside of the hackney garage on the night in question. See *Koonce* v. *Commonwealth*, 412 Mass. 71, 75 (1992), quoting *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 411 (1978) (issues of credibility and weight of evidence are for jury). Other drivers testified that they had seen the victim with a black bag on numerous prior occasions, and the victim's uncle testified that the victim "always" carried a black bag when working. The jury also heard testimony that it was the general practice of taxicab drivers to carry a street guide while at work, and that drivers were required to carry a small hackney license.

In sum, the Commonwealth introduced evidence sufficient to satisfy a reasonable fact finder that the defendant took an item of value from the victim. The jury heard testimony from which they could reasonably infer that the victim had small denomination currency, a black bag, a street guide, and a small hackney license on his person the night he died. Given statements from law enforcement officials and the victim's uncle indicating that none of these items was recovered, the jury were permitted to conclude that they were absent due to a robbery.

The Commonwealth supplemented its evidence that items had been taken from the taxicab with evidence from which the jury could have inferred that the defendant planned to rob the victim. Petway testified that the defendant confessed to having killed a taxicab driver during a robbery gone bad. The jury heard that the defendant placed a call to Brown shortly before his first call to a taxicab dispatcher, telling Brown to wait by his telephone, and that the defendant and Robinson went to Cleveland Circle with knives wrapped in aluminum foil to avoid fingerprints. The jury heard further that, although it was a warm evening and the Fidelis Way housing development was a fifteen-minute walk from Cleveland Circle, the two men insisted on taking a taxicab to the housing development, waiting forty minutes after placing four calls to taxicab companies in an effort to find a driver who would pick them up in Brighton. They also heard that the defendant repeatedly called a Brookline taxicab company, whose vehicles do not have partitions separating the driver and passengers that might impede physical contact between them.

The Commonwealth's case regarding whether something of value had been taken from the victim did not deteriorate after the defendant presented his evidence, which largely corroborated the Commonwealth's version of the facts. Although the defendant denied having been involved in a robbery or having stabbed the victim, questions of credibility belong properly to the finder of fact, *Commonwealth* v. *Molina*, 454 Mass. 232, 240 (2009), citing *Commonwealth* v. *Ortega*, 441 Mass. 170, 175 n.8 (2004), and, in considering whether the evidence is sufficient to support a conviction, should be resolved in favor of the Commonwealth. *Commonwealth* v. *Akara*, 465 Mass. 245, 253 (2013). Furthermore, evidence of consciousness of guilt "may be sufficient to amass a quantum of proof necessary to prove guilt" when "coupled with other probable inferences." *Commonwealth* v. *Booker*, 386 Mass. 466, 470 (1982). Viewed in the light most favorable to the Commonwealth, we conclude that the evidence here was sufficient to support the defendant's conviction of armed robbery, the predicate offense for his conviction of murder in the first degree. See *Commonwealth* v. *Housen*, 458 Mass. 702, 707 (2011) (evidence sufficient for armed robbery as predicate for felony-murder even where jury required to make substantial inferences).

d. *Motion for new trial.* The defendant contends that the judge erred in denying his motion for a new trial on the ground of ineffective assistance of counsel. The motion was predicated upon trial counsel's asserted failure to object to the Commonwealth's introduction of purportedly inadmissible business habit evidence and his failure to investigate two matters. As to the latter, the defendant maintained that counsel's failure to inquire into three dispatch tickets received by the victim on the night of his death and his failure to detect certain components of the hospital surveillance video recording (video) caused him to neglect salient exculpatory evidence.

When a defendant appeals from the denial of a motion for a new trial brought on grounds of ineffective assistance of counsel, he must demonstrate that counsel's conduct fell "measurably below that which might be expected from an ordinary fallible lawyer," and that, but for counsel's error, something material might have been accomplished in the defendant's favor. *Com-*

*monwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). See *Strickland* v. *Washington*, 466 U.S. 668, 690 (1984).

> "[I]f a defendant convicted of murder in the first degree is unable to show on his direct appeal that, as to an unpreserved claim of error, there is a substantial likelihood of a miscarriage of justice, he would not prevail by asserting as to the same issue the ineffectiveness of his counsel. In other words, the statutory standard of § 33E is more favorable to a defendant than is the constitutional standard for determining the ineffectiveness of counsel. [In such circumstances], we need not focus on the adequacy of trial counsel's performance [but] shall consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion."

*Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

The decision whether to allow a motion for a new trial lies within the discretion of the judge and will not be reversed unless "manifestly unjust or unless the trial was infected with prejudicial constitutional error." 429 Mass. 763, 770 (1999). See *Commonwealth* v. *Medina*, 430 Mass. 800, 802 (2000). We afford particular deference to a decision on a motion for a new trial based on claims of ineffective assistance where the motion judge was, as here, the trial judge. See *Commonwealth* v. *Waters*, 410 Mass. 224, 231-232 (1991), quoting *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986); *Commonwealth* v. *Myers*, 51 Mass. App. Ct. 627, 632 (2001), citing *Commonwealth* v. *DeVincent*, 421 Mass. 64, 69 (1995).

i. *Failure to object.* The defendant argued in his motion for a new trial, as he did on appeal, that counsel wrongly failed to object to the Commonwealth's introduction of evidence indicating that, as a matter of business habit, the victim carried a black bag, a street guide, cash in small denominations, and a small hackney license while working. The defendant contends that the Commonwealth failed to lay a sufficient foundation for this evidence for two reasons: first, the testimony indicated only that many taxicab drivers carry certain items and not that the victim

himself carried those items; and second, even if the victim did habitually carry certain items, such habits were personal and not business-related.

A proponent of business habit evidence must demonstrate both that the routine in question constitutes a habit and that the habit is a business habit. *Palinkas* v. *Bennett*, 416 Mass. 273, 276-277 (1993). Here, seven witnesses testified that they saw the victim with a bag while he was working or leaving work, stating that the victim "always," "most of the time," "usually," or "many times" had the bag with him while he worked. The victim's uncle testified that the victim carried a street guide, cash in small denominations, and a small hackney license while he worked. This testimony, which described a work-related routine that recurred over a significant period of time, see *id.* at 278, is akin to evidence of business habits that have been deemed admissible. Compare *Figueiredo* v. *Hamill*, 385 Mass. 1003, 1003-1004 (1982) (pedestrian's habitual recklessness was personal habit), with *Palinkas* v. *Bennett, supra* (doctor's routine for discharging certain patients was business habit), and *Commonwealth* v. *Torrealba*, 316 Mass. 24, 30 (1944) (business habit for store to provide sales receipt).

Because there was no error in the judge's decision to admit evidence that the victim carried a black bag and other items as a matter of business habit, *Palinkas* v. *Bennett, supra* at 277 (trial judge's determination of admissibility should be overruled "only when [that ruling] is clearly wrong"), the failure to object does not constitute ineffective assistance of counsel. See *Commonwealth* v. *Walker*, 460 Mass. 590, 609 (2011) (no ineffective assistance where "the judge would have overruled defense counsel's objections . . . and was within [her] discretion in doing so."

ii. *Failure to investigate.* The defendant contends also that trial counsel was ineffective for failing to investigate and present evidence regarding two matters. First, further inquiry into three dispatch tickets issued to the victim could have explained why the victim had no bills in small denominations on his person at the time of his death. Second, detecting in the surveillance video the presence of an ambiguous shadowy movement could have strengthened counsel's claim that someone other than the

defendant robbed the victim. Both claims are, ultimately, unpersuasive.

A. *Dispatch tickets.* Trial counsel obtained and reviewed copies of dispatch tickets issued to the victim on the night of his death.[29] The defendant submits that, had counsel determined whether each ticket resulted in a taxicab ride, and, if so, the denomination of the bills in which the passenger tendered payment, he could have demonstrated that the absence of small bills on the victim's person[30] was not the result of a robbery, but instead a result of the victim's having used those bills to make change prior to picking up the defendant.

Where the Commonwealth's theory of armed robbery relied at least in part on the victim's possession of small bills at the time of his death, we assume for the sake of analysis that counsel's failure to investigate the dispatch tickets fell below the minimum standard of performance we set forth in *Commonwealth* v. *Saferian, supra* at 96. Trial counsel submitted an affidavit, introduced at the hearing on the defendant's motion for a new trial, stating that he saw no need to conduct any further investigation into the tickets and could not "recall appreciating [the tickets'] significance." Yet, the tickets bore on whether the victim had paid out his small bills at the time the defendant entered the vehicle; additional inquiry might have produced passengers whose payment required the victim to use small bills for change. Moreover, counsel could not recall any "strategic reason" for declining to seek additional information

[29]These tickets were compiled by dispatchers for Bay State who were on duty the night the victim was stabbed. They contain the time of the dispatch, the name of the driver who received it, the partial name of the person who called to request a taxicab, and the general area that person wanted to go. They do not, however, establish whether the callers were ever picked up, the amount of money the ride cost, and, if cash was used, what denominations of cash were used to pay the fare.

[30]The Commonwealth maintained that the defendant and Robinson took only small bills from the victim, and did not steal the five twenty dollar bills found in his pants pocket. To support this theory, the Commonwealth elicited testimony that taxicab drivers generally segregate small bills from twenty dollar bills. The victim's uncle, who was also a taxicab driver, testified that the victim kept small bills for change in his black bag. The Commonwealth thus sought to demonstrate that the defendant and Robinson had taken the victim's black bag, which contained bills in small denominations, but did not take the larger bills that were on his person.

about the tickets; his failure to utilize available physical evidence was not grounded in any deliberate, tactical decision. See *Commonwealth* v. *Baran*, 74 Mass. App. Ct. 256, 277-278 (2009) (error where counsel "fail[ed] . . . to explore" significant physical evidence "through better pretrial preparation").

However, in conducting our review pursuant to G. L. c. 278, § 33E, we "need not focus on the adequacy of trial counsel's performance," examining instead the impact of any error on the jury's conclusion. *Commonwealth* v. *Wright, supra* at 682. Here, appellate counsel's subsequent efforts as to the tickets suggest little reason to think that the jury's decision would have been swayed by the information that might have been unearthed. Specifically, appellate counsel located Peace DiPiro, the subject of one of the dispatch tickets, whom the victim picked up on a 12:27 A.M. dispatch and who regularly took a taxicab along the same route. She stated in an affidavit that, while she did not remember the taxicab ride that night, she usually paid her fare in either a ten dollar bill or a twenty dollar bill. It is not evident how this evidence would have assisted the defendant, as it increases the likelihood that the victim had bills of small denomination on his person just one-half hour before he picked up the defendant. Because appellate counsel apparently did not locate any of the other passengers listed on the dispatch tickets, or indicate that it would have been possible to have done so prior to trial, it is purely speculative whether those tickets resulted in taxicab rides and, if they did, whether cash was used in payment and, if so, in what denominations.

Furthermore, even without having investigated the three tickets, trial counsel argued that intervening street fares accounted for the lack of small currency, eliciting testimony from the taxicab dispatcher that radio dispatch tickets were only one way that drivers obtained fares. In light of the strength of the Commonwealth's evidence, including the defendant's inculpatory statements, and the fact that appellate counsel could not demonstrate how additional investigation into the three dispatch tickets would have bolstered the defendant's contention regarding the absence of small bills on the victim's person, any further investigation of the tickets would have been unlikely to have swayed the jury's result. See *Commonwealth* v. *Wright, supra* at

688-689 (strong evidence against defendant made any error on counsel's part unlikely to influence jury).

B. *Surveillance video*. The defendant also alleges that a shadowy movement approaching the taxicab, visible in the hospital surveillance video approximately twenty minutes after Pizarro appears, constitutes evidence that a person other than the defendant went into the taxicab and took the black bag and other items. He maintains accordingly that counsel was ineffective since, despite watching the entire video, he neither noticed this movement nor argued its significance to the jury.

Trial counsel's treatment of the hospital surveillance video did not constitute a "culpable failure to investigate." See *Commonwealth* v. *Caillot*, 454 Mass. 245, 265 (2009), cert. denied, 559 U.S. 948 (2010). Counsel averred that he "watched the entire video from start to finish many times," yet "never noticed that the videotape also depicts a shadowy movement in the parking lot [between 1:50 and 1:51 A.M.]," and, in denying the motion, the judge cited the apparent "uncertainty that the barely visible shadowy figure was even a person." Where a private investigator hired by defense counsel also did not notice the shadowy figure, the failure to notice the shadowy movement cannot have fallen below the level of an ordinary fallible lawyer. As the judge correctly held, counsel's decision not to retain an expert to review the video did not, under these circumstances, constitute ineffective assistance. See *Commonwealth* v. *Dyer*, *supra* at 752 (counsel not ineffective where "only a theoretical possibility" that further investigation would prove fruitful).

Given the foregoing, we discern neither error nor abuse of discretion in the denial of the defendant's motion for a new trial. Because we affirm the defendant's conviction of felony-murder, we vacate as duplicative the predicate armed robbery conviction. See *Commonwealth* v. *Semedo*, 456 Mass. 1, 3 (2010) (affirming conviction of felony-murder predicated on armed robbery and vacating armed robbery conviction as duplicative), citing *Commonwealth* v. *Gunter*, 427 Mass. 259, 275-76 (1998), cert. denied, 132 S. Ct. 218 (2011). See also *Commonwealth* v. *LeBeau*, 451 Mass. 244, 263 n.20 (2008) (vacating duplicative conviction and vacating underlying indictment even where that conviction was placed on file).

4. *Conclusion.* The judgment of conviction of armed robbery is vacated and the verdict is set aside. The judgment of conviction of murder in the first degree is affirmed. The order denying the motion for a new trial is affirmed.

*So ordered.*